[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 12, 2009
THOMAS K. KAHN
CLERK

No. 04-15535

_____

D.C. Docket No. 97-00181-CV-CDL-4

CARLTON MICHAEL GARY,

Petitioner-Appellant,

versus

HILTON HALL,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(February 12, 2009)

Before TJOFLAT, WILSON and ANDERSON, Circuit Judges.

TJOFLAT, Circuit Judge:

Twenty-two years ago, in the Superior Court of Muscogee County, Georgia, twelve jurors unanimously found Carlton Gary guilty of three counts of murder, rape, and burglary. As a result of the murder convictions, Gary was sentenced to death. Since then, he has pursued every possible legal avenue available to him to obtain a new trial. In all, his convictions and death sentences have been reviewed on at least ten separate occasions. In each instance, he has been denied relief. The review here is of the United States District Court for the Middle District of Georgia's denial of his petition for a writ of habeas corpus. We find no merit in the issues presented and therefore affirm.

## I.

## A.

In its order denying habeas corpus relief, the district court painstakingly parsed the transcript of Gary's trial and provided a detailed summary of the facts giving rise to Gary's arrest and convictions. Gary v. Schofield, 336 F. Supp. 2d 1337 (M.D.Ga. 2004). We excerpt the relevant factual portion of the court's order:

> Between the fall of 1977 and spring of 1978, terror gripped the historic Wynnton neighborhood in Columbus, Georgia. Targeting elderly white women, an assailant sexually assaulted nine women,

killing seven of them and leaving stockings around their necks as his calling card. Labeled the "stocking strangler" by the local news media, the assailant suddenly ceased his activities in the Wynnton area in 1978 and eluded authorities for six years.

These crimes remained unsolved until 1984 when a pistol that was stolen from a home in the Wynnton area in October 1977 was linked to [Gary]. [Gary] was arrested on May 3, 1984 for this burglary. After acknowledging his Miranda rights,[1] [Gary] confessed that he was present at the burglary and that he was either present at, or had knowledge of, eight of the nine 1977-78 Wynnton area rapes and murders. [Gary] stated that he burglarized these women's homes while an individual named Malvin A. Crittenden committed the rapes and murders. The authorities found no corroborating evidence linking Crittenden to the crimes.

[Gary]'s fingerprints were ultimately found to match the latent prints found at four of the crime scenes. Blood evidence and hair samples taken from the crime scenes were inconclusive–they did not establish [Gary] as the perpetrator, nor did they exclude [Gary].

An investigation into [Gary]'s background revealed his connection to similar crimes in the past. Specifically, on April 14, 1970, the body of eighty-five year old Nellie Farmer was found in her residence in Albany, New York. She had been raped, strangled, and her body was covered. A fingerprint taken at the scene matched [Gary's]. When arrested and confronted with this evidence, [Gary] claimed that he was at the crime scene, but an individual by the name of John Lee Mitchell actually raped and killed Mrs. Farmer. Mr. Mitchell was acquitted of these charges.

On January 2, 1977, fifty-five year old Jean Frost was attacked and raped during a burglary of her home in Syracuse, New York. One of the items taken during the burglary was her watch. When [Gary] was taken into custody two days later, he had the watch in his pocket.

---

[1]See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[Gary] confessed to being the "lookout" for the Frost burglary. He claimed that an individual named Dudley Harris committed the attack and rape. Mr. Harris was not convicted for the crimes.

Regarding the Columbus "stocking strangler" crimes, [Gary] was indicted for raping, murdering, and burglarizing the homes of three of the nine victims – Ruth Schieble, Martha Thurmond, and Kathleen Woodruff. At trial, the Prosecution introduced evidence of the attacks on the other "stocking strangler" victims, claiming that they showed a similar pattern and were also committed by [Gary]. The evidence presented by the Prosecution to show a similar pattern included the following. All of the victims were elderly white women between the ages of 55 and 89. Each of the victims lived alone. In each crime, the assailant broke into the woman's home and burglarized her residence. With the exception of one, all of the crimes happened at night. All of the elderly women were sexually assaulted. All of the attacks involved ligature strangulation, usually with the victim's stockings or pantyhose. With the exception of only one attack, all of the attacks occurred in the Wynnton area of Columbus, Georgia. Every deceased victim had been either partially or totally covered after the attack.

The evidence at trial showed that Mrs. Schieble was raped, beaten, and strangled to death with a stocking on October 21, 1977. She was eighty-nine years old at the time, legally blind, and could walk only with the aid of a walker. Mrs. Schieble's son and his wife discovered her lifeless, covered body on October 21, 1977.

Martha Thurmond's body was discovered on October 25, 1977. Her body was covered by a pillow, blankets, and sheets. The evidence showed that Mrs. Thurmond was sexually assaulted, beaten, and strangled with a stocking.

On December 28, 1977, the body of seventy-four year old Kathleen Woodruff was discovered, partially covered, and lying on her bed. Mrs. Woodruff had been raped and strangled with a scarf.

4

The similar crimes evidence showed that Gertrude Miller was attacked on September 11, 1977.  She was raped and severely beaten.  Knotted stockings, similar to the ones used to strangle the other victims, were found at the scene.  Mrs. Miller survived the attack and identified [Gary] as her assailant.

The body of fifty-eight year old Mary "Fern" Jackson was discovered on September 16, 1977.  Her body was covered and she had been beaten and raped.  Mrs. Jackson was strangled to death with a stocking and a sash from a dressing gown.

Seventy-one year old Jean Dimenstein was raped and strangled to death with a stocking in her home on September 24, 1977.  Her body was covered with sheets and a pillow.

On February 11, 1978, police responded to a call and found Mrs. Ruth Schwob sitting on the edge of her bed with a stocking tied around her neck.  Mrs. Schwob never identified [Gary] as her assailant.  Although she survived the February 11, 1978 assault, she died before [Gary] was charged and tried.

On February 12, 1978, the body of seventy-eight year old Mildred Borom was found lying in a hallway of her home.  She was lying on her back with her face covered.  Mrs. Borom had been strangled with a venetian blind cord.  She also had been raped.

On April 19, 1978, sixty-one year old Janet Cofer's body was found lying in her bed covered with linen and with a pillow over her face.  Mrs. Cofer had been raped and strangled with a stocking.  Although Mrs. Cofer did not reside in the Wynnton area of Columbus (as all of the other victims did), she had attended choir practice at the Wynnton Methodist Church on the evening of her murder.

Id. at 1341-43 (internal citations and footnotes omitted).

B.

Gary was indicted in Muscogee County on May 4, 1984 and charged with three counts of malice murder, three counts of rape, and three counts of burglary. The alleged victims were Ruth Schieble, Martha Thurmond, and Kathleen Woodruff. On May 9, Judge John Land of the Muscogee County Superior Court found Gary to be indigent and appointed two lawyers, William Kirby and Stephen Hyles, to represent him.

On June 20, defense counsel filed several motions. They requested funds to hire an investigator and to travel to interview potential witnesses; they asked the court to have Gary evaluated by psychiatric and psychological experts for the purpose of determining mental competence; and they sought the production of all physical evidence in the State's possession, including fingerprints, hair, blood, and bodily fluids obtained from the scene of some of the murders. They also sought the reports of experts employed by the State to examine such evidence and requested funds to hire independent experts to examine the evidence. In addition, they sought complete access to the State's investigative files, including statements Gary made to the police, a list of the witnesses who appeared before the grand jury, and any exculpatory Brady material.[2] They also moved for a change of venue

_____

[2] See Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

and the severance of the indictment counts, so that the murder and rape counts would be tried separately from the burglary counts. Lastly, counsel requested a preliminary hearing for the purpose of narrowing the issues for trial.

On July 17, Judge Land convened a hearing on defense counsel's motions. After hearing from the parties, the court granted all of the motions except the motion for funds to hire independent experts to examine the State's physical evidence and the motion for a psychiatric and psychological evaluation. As to those two motions, the court deferred its ruling. At the end of the hearing, the court scheduled the trial for December 3, 1984 in Columbus.[3]

On August 28, August F. Siemon, an Atlanta lawyer, filed a notice of appearance, representing that Gary had retained him as defense counsel.[4] He attached a statement from Gary indicating that he was Gary's counsel of choice, with the authority to retain additional counsel as necessary. Siemon withdrew Kirby and Hyles's requests for a severance and for a change of venue and requested that the court withhold ruling on the motions for a psychiatric and

---

[3] The trial date was subject to several postponements.

[4] Shortly after filing the notice of appearance, Siemon told the State's prosecutors, William J. Smith and Douglas G. Pullen, Muscogee County District Attorney and Assistant District Attorney, respectively, that he only took the case because it was such a good "funds case." Respondent's Exhibit 74, at 203. Siemon continued, "one of the legal issues that has intrigued me was the issue of funds." Id.

7

psychological evaluation and for funds to hire experts.[5]  On August 29, after

determining that Siemon would be representing Gary as independently retained

counsel, Judge Land entered an order discharging Kirby and Hyles as defense

counsel.  The order instructed Kirby and Hyles to make their investigative files

and work product available to Siemon and gave Siemon thirty days to review the

pending motions.

By mid-September, Siemon decided that he needed the services of co-

counsel and an investigator.  He moved the court to authorize him to hire an

investigator and to reappoint Kirby to act as co-counsel.  At a hearing on the

motion, Siemon informed the court that he had handled between 50 and 60 capital

cases in the past four or five years, as lead or associate counsel, and that he had

handled 400 cases during his first two years as a public defender from 1977 to

1978.  Despite this experience, he said that he would be unable to handle Gary's

case alone.  Siemon told the court that he was representing Gary pro bono and

lacked funds to associate another lawyer or pay an investigator.  In the next breath,

however, he represented that he had the resources to provide Gary full

---

[5]  The court subsequently denied, on multiple occasions, Siemon's requests for funds for experts, as indicated in the text, infra.  The record does not indicate the disposition, if any, the court made of the motion Kirby and Hyles had filed seeking a psychiatric and psychological evaluation of Gary.  As indicated in the text, infra, the court had Gary evaluated in March 1986.

representation, stating, "[t]here's no question in my mind that I have the personal resources to provide representation to [the defendant]." Transcript of Proceedings, September 25, 1984, at 44. At this point, Judge Land explained Gary's options to Gary and Siemon:

> It's recognized by all the parties here I'm sure that there are three alternatives that this defendant has been faced with. One is to represent himself. Obviously he has not chosen that route.
>
> Two, to plead indigency and have counsel appointed. He did plead indigency, the Court found that he was indigent, and appointed counsel to represent him.
>
> Thirdly, which is superior to the other two, is to procure counsel of his choice . . . And so I take the position in this instance at this time that Mr. Gary has exercised the third alternative of procuring counsel of his choice and certainly the Federal Courts, the United States Supreme Court, says he has that right. He has exercised it.
>
> Now the court originally named Mr. Kirby as lead counsel in this case because of his impressive qualifications and experience . . . Mr. Siemon, on behalf of Mr. Gary, you asked that he be relieved as lead counsel and that you be appointed lead counsel. And the Court has allowed that . . . .
>
> You have pointed out to the Court in your initial urging of this matter, Mr. Siemon, that the defendant has no right – an indigent defendant has no right to an attorney of his choosing. . . . I cannot at this time allow [Gary] to name indigent appointed counsel of his choice and I decline to reappoint Mr. Kirby in this case.

Id. at 64-66. Siemon then inquired again about funding for an investigator. Judge Land denied his request without prejudice. See id. at 67.

9

Siemon continued to seek co-counsel, and on October 11, Bruce S. Harvey, an Atlanta attorney, filed a notice of appearance. On December 10, Siemon moved the court to appoint Gary Parker, a Columbus attorney, as co-counsel.[6] Judge Land denied the motion, and Parker filed a notice of appearance as co-counsel. Once assembled, this defense team of three lawyers filed scores of pretrial motions, some of which dealt with the disclosures the State had made pursuant to the court orders Kirby and Hyles had obtained. Included in counsel's motions were requests for funds to hire experts, including a forensic serologist; to pay for Siemon's trips out of state to interview witnesses; and to employ an investigator. As to each request for funds, Judge Land asked Siemon to identify the experts he wished to employ and the purpose of their employment, and, on each occasion, Siemon said he would not disclose the information unless the court permitted him to do so ex parte and in camera. The court denied his request to proceed ex parte and in camera; Siemon did not disclose the information; and the court denied his requests for funds.[7]

---

[6] Nelson Jarnigan, of Harvey and Jarnigan, also appeared as co-counsel for Gary. His participation in the case was limited, the bulk of the work being performed by Siemon and Harvey.

[7] In support of one of his requests for funds, Siemon did present the court with a written proffer – which he shared with the prosecution – stating that he needed a "forensic consultant," a "jury expert," and an investigator. However, Siemon identified none of these persons or the sum of money he purportedly needed.

As they were preparing the case for trial, Siemon, Harvey, and Parker made an appointment to visit the Georgia Bureau of Investigation ("GBI") Crime Lab for the purpose of interviewing the Crime Lab serologist and other experts who had examined the physical evidence the police had uncovered at the crime scenes: serological fluid (blood and semen), fingerprints, and hair. The prosecution had provided the defense with the official Crime Lab reports of these examinations, signed by the Crime Lab's Director, but not with the notes the experts had made while performing the examinations. The notes would have been available to defense counsel, but counsel did not request them. For reasons not revealed by the record, defense counsel canceled their appointment with the GBI Crime Lab.[8]

---

[8] As this court explained earlier in a similar context, when counsel for an indigent defendant requests expert assistance, counsel should first perform a modicum of basic investigative/legal research. Such preliminary research will very likely elucidate, for both the defense and the trial court judge, the need, if any, for expert assistance. In Moore v. Kemp, 809 F.2d 702 (11th Cir. 1987), the indigent defendant challenged the trial court's denial of expert funding. In rejecting his challenge, we noted,

> [T]hree days before the [defendant's] attorney presented his motion for the appointment of an expert to [the trial court], the prosecutor gave him copies of the reports he had received from the state crime lab and the names of the experts who had authored the reports and would testify for the prosecution. Inexplicably, [defendant's] counsel never informed [the trial court] what those reports disclosed or the areas of expertise of the persons who had made them and, presumably, would testify at trial. Counsel also failed to inform [the trial court] whether he had interviewed the State's experts about any tests they may have performed and, if not, whether they would be amenable to such interviews. A thorough study of the crime lab reports and interviews with the authors of the reports may have eliminated any need for expert assistance. At the very least, if defense counsel had been more diligent in his study and more specific in his motion, [the trial court] would have been more fully apprised of the prosecution's case and of the

11

On February 8, 1985, Siemon filed a motion to recuse Judge Land.[9]  The motion stated that Judge Land should be removed because of "extra judicial knowledge and bias," including his knowledge of certain facts and circumstances expected to be introduced as evidence.  Judge Land voluntarily recused, and on May 13, Judge Bell assigned Judge E. Mullins Whisnant to preside over the case. Nine days later, on May 22, Siemon filed a motion to recuse Judge Whisnant, arguing that the judge had served as the Muscogee County District Attorney in the Chattahoochee Judicial Circuit while the "Stocking Strangler" case was being investigated.  Judge Whisnant voluntarily recused on May 30, and the same day, Judge Bell appointed Judge Kenneth Followill of the Muscogee County Superior Court to preside over the case.[10]

At some point during the first five months of 1985, Siemon petitioned the Muscogee County Superior Court for a writ of habeas corpus challenging Gary's

defense's need, if any, for expert assistance.

Id. at 717-18.

[9]  The same day, he moved the court for further disclosure of Brady material by the prosecution.  The motion lay dormant until February 18, 1986.

[10]  Judge Followill handled the case to its conclusion.  He heard several of Siemon's pretrial motions, including motions to suppress the post-arrest statements Gary made to the police and physical evidence the State intended to introduce in its case in chief.  The latter motions were denied, as were Siemon's motions to disqualify certain State experts from testifying.

conditions of confinement pending trial.  The petition, directed to the Muscogee County Sheriff, Gene Hodge, alleged that Gary's conditions of confinement were cruel and unusual and asked the court to order the Sheriff to provide Gary with more humane accommodations or to release him from custody.[11]  At a one day hearing on the petition, the Sheriff took the position that the writ of habeas corpus was not the appropriate remedy for the relief Gary was seeking.[12]  The record does not indicate the court's disposition of the petition, but we assume that the court denied the writ because Gary remained in the Muscogee County Jail for the duration of his prosecution.

On July 3, Judge Followill heard Gary's motion for funding for an investigator.  At the hearing, the court learned that defense counsel had only interviewed "approximately 10 to 15 witnesses" in the previous ten months.  Respondent's Exhibit No. 26 at 64.  In light of this information, Judge Followill expressed skepticism that defense counsel would make good use of public funds.  He stated to Siemon, Harvey, and Parker: "[e]vidence that you have only talked to

---

[11]  The petition alleged, among other things, that Gary was being kept in solitary confinement, was being denied exercise privileges, and was being harassed by jail personnel.

[12]  A petition for a writ of habeas corpus challenges the authority of the petitioner's custodian to hold the petitioner.  The Sheriff was holding Gary pursuant to the Muscogee County Superior Court's order that he be detained in the county jail.  What Gary should have done was to seek relief from the judge who denied his request for release on bail and ordered him detained.

10 or 15 witnesses in this case in 10 months doesn't go a long way towards impressing me with how you expend your time, and I'm wondering how you are going to expend this money." He continued,

> I presume that with the experience that you lawyers have and have described to me that you normally don't place a witness on the stand to testify until you've talked to him yourself . . . you are going to have to talk to these people anyway and why in the world have you not talked to more than 15 of them up until now? That really takes me back.

Id. at 68, 78.

On October 7, 1985, at another hearing on defense motions, Judge Followill revisited defense counsel's request for funds for an investigator, once again asking Siemon, Harvey, and Parker how many witnesses they had interviewed. Siemon responded that in the three months that had elapsed since the July 3 hearing, they had interviewed no witnesses. Respondent's Exhibit No. 27, at 133-34. In response, the judge said

> [Y]ou have taken on the duty to represent your client and you haven't interviewed but 10 or 15 witnesses when you've been supplied all the names all this time. How are you going to discover the facts of this case? What does it take in the way of funding while you are in Columbus, Georgia, to call a few witnesses, go by to see them and talk to them? You've got four lawyers involved in this case. Three of you have made it to Court even if it's been just for the purpose of presenting these motions . . . and here you are sitting in this courtroom telling me that you haven't done the most basic thing that any lawyer would do . . . .

14

I know Mr. Parker has a law practice to carry on and I know that you all have other things you've got to do too; but as far as this Court is concerned, you don't have a more important case right now than protecting this man's life and liberty.

Id. at 137-38, 141.

Judge Followill then turned to Gary over Harvey's objection: "Mr. Gary, you've heard this team of lawyers representing you say that they have not interviewed anymore [sic] witnesses than they had back in August . . . . [A]re you satisfied that you are receiving the proper advice and representation in this case?" Id. at 143. Gary did not respond. The judge put the question to him two more times, with no response.

At this point, after conferring privately with Gary and his co-counsel, Parker moved the court for permission to withdraw, citing the court's refusal to provide funding as the basis for his motion. The court denied the motion on the ground that it was improperly presented. On December 18, Parker moved the court to withdraw with his client's consent, and the court granted the motion.

On February 6, 1986, Judge Followill set March 10, 1986, as Gary's trial date. On February 18, he granted Siemon's motion for disclosure of Brady material, ordering an in camera inspection of the prosecution's file, consisting of

15

some 12,000 pages.[13]  The court reviewed the file and ordered the disclosure of any potentially exculpatory material.

C.

The case was called for trial on March 10, as scheduled.  Three hundred venire-persons had been summoned to the Muscogee County Courthouse in Columbus for jury duty, and the prosecution had subpoenaed 150 witnesses.  Before Judge Followill assumed the bench, he was informed that Gary, who was being detained in the Muscogee County Jail, refused to get dressed and come to court.  Judge Followill informed Siemon and Harvey, and they went to the jail.  They returned to court and filed a "Notice of Intention to Raise Issue of Mental Incompetency" and a "Special Plea of Incompetency."  Accompanying the special plea was an affidavit by Harvey stating that he had been observing Gary's physical and mental condition in a "steady decline and debilitation."

Judge Followill and counsel immediately retired to chambers to consider these filings.  At that time, Harvey supplemented what he had stated in the affidavit.  In light of Harvey's statements, the court declared a two-day recess.  On March 12, the court and counsel reassembled in chambers.  Siemon moved the

---

[13]  Siemon renewed his Brady motion on February 26.  A formal ruling on the motion was unnecessary, since Judge Followill was reviewing the State's documents in camera as the defense requested.

16

court to have Gary examined by an independent psychiatric expert who would "assist the defense."[14] Judge Followill, concluding that it was the court's responsibility to determine whether Gary was competent to stand trial, denied Siemon's motion and instead ordered that the Georgia Department of Human Resources "conduct a complete physical, psychological, neurological, and psychiatric examination of the defendant" with respect to his competency to stand trial and his mental competency at the time of the alleged crimes.

Gary was evaluated by the Forensic Services Division of Central State Hospital in Milledgeville on March 28. On admission to the hospital, Gary met with the Director of Admissions and asserted his right to consult with his lawyer. The Director provided Gary with a telephone, and Gary called Siemon. They

---

[14] Siemon cited Ake v. Oklahoma, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985), and Justice Rehnquist's dissent in particular, as requiring that the court have Gary examined by an independent psychiatrist selected by, and therefore favorable toward, the defense. Neither Ake nor Justice Rehnquist's dissent supported Siemon's position. In Ake, the Court said this after holding that the state trial court should have provided for the examination and evaluation of the defendant's competency to stand trial and sanity at the time of the offense:

> This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist . . . and as in the case of the provision of [court appointed] counsel we leave to the State the decision on how to implement this right.

Ake, 470 U.S. at 83, 105 S. Ct. at 1096.

spoke for fifteen minutes. After that, Gary was taken to the Forensic Services Division's psychiatrist and psychologist assigned to the case. During the five days he spent at the hospital, Gary refused to speak to them or otherwise cooperate in the evaluation they had been ordered to perform. But he did mingle with some of the patients at the hospital, especially during the recreation periods, and talk to members of the hospital staff.

Judge Followill scheduled the trial on Gary's special plea of mental incompetency for April 21, in Columbus. On April 11, Siemon filed a motion in limine to prevent the Forensic Services Division's psychiatrist and psychologist from testifying as to Gary's competency to stand trial. Siemon argued that unless the court provided for an "independent" evaluation, rather than one performed by the State, they should be barred from testifying. The court denied his motion.

The competency trial commenced on schedule with jury selection, which took one day to complete. The trial, itself, consumed the following four days. Five witnesses testified: the Director of Admissions of the Central State Hospital, the psychiatrist and psychologist who undertook to evaluate Gary, Sheriff Hodge, and Gary Parker. Siemon called Parker and Hodge to the stand to establish Gary's incompetency. Parker testified that Gary's ability to communicate with defense counsel had been steadily declining, such that it was extremely difficult to prepare

18

a defense. The Sheriff testified that Gary had been confined alone for two years, without exercise, and had refused to eat for prolonged periods of time.

The Director of Admissions and the psychiatrist and psychologist testified as court witnesses. The two experts acknowledged that Gary had refused to cooperate with them. The psychologist said that it was difficult to determine whether Gary was malingering or whether he was manifesting symptoms of mental illness; he therefore rendered no opinion as to Gary's competence to stand trial. The psychiatrist opined, based on forty years of experience, that Gary was not manifesting a mental illness and thus was competent to stand trial. The Director of Admissions said that he saw nothing abnormal in Gary's behavior, and that Gary was fully cognizant of his rights. On April 28, at the conclusion of the competency trial, the jury found against Gary on his special plea of mental incompetency.

On June 9, the trial commenced in Columbus with jury selection. One day later, Siemon filed a motion for the recusal of Judge Followill because he had submitted to an interview by a reporter with the Columbus Ledger & Enquirer in which he stated that "there is no provision in law" requiring that public funds be provided to privately retained attorneys in a criminal case. While this motion was pending, Siemon moved the court for a change of venue. On July 2, the court

19

granted the venue motion in part and ordered that the jury would be selected in Griffin, Georgia, from a Spalding County venire,[15] but the trial would take place in Columbus. The jury would be transported from Griffin to Columbus and sequestered in a Columbus hotel for the duration of the trial.

On July 7, three weeks before the trial was to begin, Harvey moved the court to permit him to withdraw or, alternatively, to appoint him to represent Gary.[16] The same day, Siemon filed a second motion for the recusal of Judge Followill, alleging that Judge Followill, by "intentionally select[ing] Spalding County so as to minimize black participation in the trial of the accused," had purposefully "injected racism into the jury selection procedures in this case." Judge Bell, the administrative judge, ordered that Siemon's two recusal motions be heard on July 21 before Judge C. Cloud Morgan of the Superior Court of the Macon Judicial Circuit. On July 24, after hearing three hours of argument, Judge Morgan, having found no merit in Siemon's motions, denied them. Meanwhile, Judge Followill granted Harvey's motion to withdraw; this left Siemon as sole defense counsel.

---

[15] Griffin is the county seat for Spalding County.

[16] Gary consented to Harvey's motion.

On August 11, the trial began, and the State opened its case in chief. The state presented a plethora of circumstantial evidence that identified Gary as the perpetrator of the charged crimes, including: (a) Gary's confession to the police that he was present at, or had knowledge of, eight of the nine rape/murder scenes; (b) Gary's latent fingerprints at four of these locations; (c) blood evidence and hair samples found at the victims' locations that included Gary in the class of potential perpetrators; (d) eye-witness testimony of Gertrude Miller, who identified Gary as the man who had attacked her; (e) pervasive modus operandi and identification-type evidence; (f) the lack of evidence supporting Gary's claimed alibi – that although Gary was present when the murders occurred, Malvin Crittenden, a childhood friend, actually committed them; (g) compelling evidence that only one person committed each rape/murder; and (h) uncontroverted evidence that the rape/murders were committed by the same person. The guilt phase of the trial ended on August 26, 1986, and the jury found Gary guilty as charged.

The penalty phase of the trial began and ended the next day, August 27. The prosecution presented documentary evidence that Gary had been convicted of a felony on three occasions in 1979[17] and rested its case. Siemon rested Gary's

---

[17] The documents established that on August 10, 1979, Gary had been convicted of escape in Onondaga County, New York; on February 22, 1979, he had been convicted of armed robbery in Greenville County, South Carolina; and on March 29, 1979, he had been convicted of

21

case without calling any witnesses or putting on any evidence. After three hours of deliberation, the jury found that, with respect to each of the three murder counts alleged in the indictment, there were two "aggravating circumstances."[18] The jury returned verdicts calling for the death sentence, and the court, bound by the jury's verdicts,[19] imposed three death sentences.[20]

## D.

On September 25, 1986, Gary moved the court for a new trial. The court, after hearing argument of counsel, denied his motion on October 18, 1986.[21] Gary, represented by Siemon, appealed the court's judgment, and the denial of his motion for a new trial, to the Supreme Court of Georgia. In his brief to the court, Siemon asserted eighteen enumerations of error. In the second enumeration, Siemon argued that the trial court refused to give him an ex parte hearing on the

---

armed robbery in Cherokee County, South Carolina.

[18] The murder was committed while the defendant was engaged in the commission of a burglary and while he was engaged in the commission of rape. See O.C.G.A. 17-10-30(b)(2).

[19] See, e.g., Jackson v. State, 198 S.E.2d 666, 667 (Ga. 1973) ("[T]he court is not privileged to invade the province of the jury and avoid its verdicts unless from clear necessity").

[20] In addition to being sentenced to death, Gary "received sentences of life imprisonment on the rape convictions and 20 years imprisonment on the burglary convictions, all to run consecutively." Gary, 336 F. Supp. 2d at 1344 (recounting sentence at trial).

[21] Siemon appeared and argued in support of the motion; Frank L. Derrickson, an Atlanta lawyer, appeared with him.

necessity of funds, contrary to the Supreme Court's holding in Ake v. Oklahoma,

470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985).  Siemon continued,

> Although Appellant was allowed to make a proffer on why he needed
> funds and indeed made such a proffer . . . Ake recognizes that it
> violates due process and equal protection to require an indigent to
> reveal his defenses and strategies to the State in order to gain the
> tools of an adequate defense.  Appellant was not prepared to make a
> showing of necessity ex parte and so the record in this case is
> incomplete on the necessity of funds.

Respondent's Exhibit No. 65, at 13 (citations omitted).

In the third enumeration, Siemon made the related claim that by failing to

grant funds, the trial court denied Gary his rights to due process, compulsory

process, confrontation, and a reliable sentencing hearing.  He stated,

> [a]ppellant's proffer on the funds issue, although . . . incomplete,
> show[ed] the necessity for funding . . . .  As Appellant argued to the
> trial court, it is a logical proposition that without funds he would be
> unable to travel to different states to interview witnesses to satisfy the
> requirements of confrontation or the out of state witness subpoena
> rules.

Id. at 14-15.

On June 26, 1987, the Georgia Supreme Court remanded the case in part,[22]

directing the trial court to "appoint competent counsel to represent defendant for

the purpose of a hearing which shall be conducted to determine if for any reason,

including the lack of funds, the defendant failed to receive effective assistance of

counsel." Gary, 336 F. Supp. 2d at 1345.[23] On July 13, Siemon, whose

---

[22] The supreme court, in remanding, invoked its jurisdiction under the Unified Appeal Procedure. See O.C.G.A. § 17-10-36 (1980). The Georgia Supreme Court's remand order stated that, if the superior court determined that Gary had received ineffective assistance of counsel, then that court must grant him a new trial. If the court determined that Gary did not receive ineffective assistance of counsel, however, the case would be returned to the Georgia Supreme Court "for review of the proceedings on remand and for the resolution of the remaining issues in the case."

[23] In Gary's brief on appeal, Siemon contended that he had been rendered ineffective because the superior court had denied him funds for expert assistance, including funds to employ a forensic serologist to analyze the semen the police found at the scene of four of the rape/murders described in the evidence presented to the jury. In Thorton v. State, 339 S.E.2d 240 (Ga. 1986), the Georgia Supreme Court held that, in particular circumstances, indigent criminal defendants were entitled to state-funded expert witness assistance. In so holding, however, the court noted that

> [t]he ruling of this case cannot serve as a basis for wide-ranging demands on behalf of indigent defendants for scientific investigative funds. This case is, assuredly, far from the normal, in that, . . . the record establishes that the possible scientific proof to be offered by the state is highly unusual in nature, as opposed to evidence such as blood samples, ballistics reports, and other routine scientific analyses.

Id. at 241.

Two years later, the Georgia Supreme Court reaffirmed the limited right of an indigent criminal defendant to receive experts provided at public expense, but it noted that the defendant must first disclose to the trial court "with a reasonable degree of precision, why certain evidence is critical, what type of scientific testimony is needed, what that expert proposes to do regarding the evidence, and the anticipated costs for services." Roseboro v. State, 365 S.E.2d 115, 117 (Ga. 1988). Roseboro did not articulate any right of a criminal defendant to make these proffers

24

performance would be the focus of the remand proceeding, again moved to have Judge Followill recused from the case. His motion was denied.

On August 14, the court appointed two attorneys to represent Gary in the remand proceeding, H. Haywood Turner, III, and Peter B. Hoffman, both of Columbus. On October 5, Siemon appeared as Gary's counsel and filed motions asserting Gary's right to have counsel of his choice and challenging Turner's legal competence.[24] The motions also complained of "the racially biased use of peremptory challenges prior to his competency trial," claimed that Gary had a "right to funds on remand," and alleged that the State had infringed "his right to have his guilt and sentence determined free from racial considerations." Respondent's Exhibit No. 80, at 1-2. On October 6, Frank L. Derrickson also filed a notice of appearance in behalf of Gary.[25]

_____

ex parte or in camera, as Siemon demanded.

Implicit in the supreme court's remand order is the notion that the trial court may have erred in denying counsel's requests for funds and that the task before the superior court was to determine whether any such denial prejudiced the defendant.

[24] On November 12, while the remand proceeding was underway, Siemon filed a supplement to his October 5 motion challenging Turner's legal competence.

[25] After Derrickson appeared, he moved the court to dismiss the two court-appointed attorneys. The court denied his motion. "[A]lthough these two attorneys were not dismissed, they did not actively participate in, or interfere with, the proceedings on remand." Gary v. State, 389 S.E.2d 218, 220 (Ga. 1990). Following the remand, in arguing Gary's appeal to the Georgia Supreme Court, Derrickson contended that the superior court's refusal to dismiss the two court-appointed attorneys somehow deprived Gary of his right to counsel of his own choice. The

25

The remand proceeding was held before Judge Followill on three separate days, November 4, 12, and 16, 1987. At the November 4 session, Siemon addressed the apparent conflict in his representing Gary on the question of his own ineffectiveness: "Anticipating that perhaps there would be an order at some point removing me as counsel . . . I consulted Mr. Gary . . . and Mr. Gary has requested the services of an independent attorney, one that's not tied to Columbus, one that's not appointed by the Court, to represent him on remand if in fact I am disqualified from further representation of him." Respondent's Exhibit No. 72 at 7. Siemon then admitted that he had refused to share the trial and pretrial transcripts with Turner, one of the court-appointed attorneys on remand, stating that "[t]he attorney [i.e., Derrickson] that's going to be representing Mr. Gary, should I be removed by order of the Court . . . has acquired the services of a New York law firm to assist him in Mr. Gary's representation and that the transcripts are now in New York being reviewed by this law firm." Id. at 8. He argued, "[o]ur position is that the transcripts contain margin notes written by me during the course of the proceedings, mostly during the pretrial proceedings, but also margin notes written by me during the course of the appeal, and those margin notes are protected by the

supreme court disagreed: "there was no denial of the defendant's right to choose his own counsel." Id.

26

attorney-client privilege and by the work-product doctrine." Id. at 8-9. Siemon added that he couldn't "waive . . . the attorney-client privilege and the work-product doctrine . . . rights [because they are Gary's], and [Gary] refuses to waive those rights." Id. at 9. The court then ordered Siemon to retrieve the transcripts and turn them over to Turner.

At the November 12 session, both Derrickson and Siemon appeared on behalf of Gary. Siemon argued that he could appear because Gary never contended that his representation was ineffective. Rather, "[w]hat Mr. Gary is alleging in this Court is that it was the trial Court's rulings that denied him the effective assistance of counsel." Respondent's Exhibit No. 73 at 7. "[T]herefore, there is no conflict between me and Mr. Gary. Mr. Gary is not alleging that I didn't represent him properly. Mr. Gary is and always has alleged that I was not allowed to represent him properly because of the Court's denial of funds." Id. After confirming that Gary wanted Derrickson to represent him, id. at 27, the court ruled that Derrickson would represent Gary and that Siemon would not. Derrickson then moved the court for funds for investigative and expert assistance, and the court denied his motion.

The State issued subpoenas for Siemon, Harvey, and Parker for the November 16 session, asserting that the effective assistance of trial counsel issue

27

could not be resolved without defense counsel's testimony.  Derrickson moved the

court, on behalf of Gary, to quash the subpoenas, arguing that the subpoenas were

> an attempt [by] the State . . . to interfere with and to destroy Mr.
> Gary's attorney-client privilege and his . . . work product . . . . The
> whole strategy of the State has been to drive a wedge between Mr.
> Gary and the lawyer of his choice, Bud Siemon.  We think it's a
> naked power play to try and get these lawyers up and cross-examine
> them about their innermost secrets and conversations with Carlton
> Gary in an effort to gain some discovery in this matter.  We think that
> that's all it is and that this Court should recognize it as that.

Respondent's Exhibit No. 74 at 101-02.

At the hearing, Derrickson asked Gary if he wished to waive his "attorney-

client privilege or [his] work product privilege," and Gary said no.  Id. at 104.

Judge Followill then asked Derrickson whether Gary understood that by asserting

the attorney-client privilege, he was effectively waiving the one issue before the

court on remand – whether there was ineffective assistance of counsel at trial.  Id.

at109.  He called a recess so that Derrickson could explain the consequences of

asserting the attorney-client privilege to Gary.  After the recess, Gary informed the

court that he could not know whether to invoke the attorney-client privilege until

he heard State's examination of Siemon.  Id. at 125.

Derrickson's sole witness at the hearing was William J. Smith, the District

Attorney.  Derrickson questioned Smith about how much the State had spent in

28

investigating and prosecuting the case. The purpose of this line of questioning was to imply that defense should have been given the funds it requested.

The State called Siemon to the stand to question him about the handling of Gary's defense. Derrickson, invoking Gary's attorney-client and work product privileges, objected to this line of inquiry – except in a few instances where the pretrial or trial transcripts provided a clear answer. Since Gary had previously indicated that he could not be sure about invoking these privileges until he heard each question, the court asked Gary individually whether he was sure he wanted to invoke the privilege after each time Derrickson objected.

The State began its questioning by inquiring into Siemon's experience in capital cases, the circumstances under which Siemon had taken the case, and the support he received from lawyers and others experienced in defending the accused in capital cases. Siemon testified that he had been lead or associate defense counsel in "[a]pproximately thirteen" capital cases, id. at 195,[26] one of the reasons he took Gary's case was because it was "such a good funds case," id. at 203, that he was well acquainted with many of the lawyers who had represented defendants subject to the death penalty, and that while he was representing Gary, he received

---

[26] At his first appearance before Judge Land, Siemon told the court that he had handled 50 to 60 capital cases.

29

advice and assistance from several of these lawyers, id. at 203-05, whom he referred to as the "Team Defense." Id. at 206. Derrickson did not object to this line of questioning.

The State then inquired into Siemon's performance in representing Gary at the pretrial and trial stages of the prosecution. Derrickson repeatedly invoked the attorney-client privilege or the work product doctrine on Gary's behalf.[27] On each occasion, Gary confirmed to the court that he agreed with Derrickson's objections. As a result, the State was unable to put forth evidence as to whether Siemon had effectively represented Gary at trial and during the pretrial proceedings. After Siemon stepped down from the witness stand, Derrickson stated that he would interpose the same objections if the State questioned Harvey or Parker. Gary told the court that he agreed with Derrickson's strategy. The State therefore declined to call Harvey or Parker, and the remand hearing concluded.

On June 12, 1989, Judge Followill entered an order finding that Gary had waived his ineffective assistance of counsel claim and, in the alternative, that Gary failed to show that he had received ineffective assistance of counsel for any

---

[27] Siemon's position throughout was that he could not waive the attorney-client or work product privileges because only Gary could waive the same. Siemon more than once told the court that he had consulted with Gary about waiving these privileges and that Gary was steadfast in refusing to waive them.

reason, including lack of funds. In holding that lack of funds did not render counsel's performance ineffective, the court addressed each time the court had denied a request for funds.

In addressing the denial of funds for a serologist, the court noted that "[d]efense counsel made a request for funds to employ a forensic serologist to mount an 'attack on the reliability of electrophoresis, a form of testing of bodily fluid samples.'" Order at 7. However, had counsel kept an appointment they had scheduled with the GBI Crime Lab, "they would have discovered that electrophoresis was not used in [Gary's] case . . . This court is at a loss to see the relevance of an attack on a test that was not conducted." Id. The court further noted that the defense did not need an expert serologist because the prosecution's only blood evidence

> was that this defendant could not be eliminated as the donor of the serological samples. It is uncontested by either party that the defendant was included as a possible donor with literally millions of other persons . . . . Any evidence that only includes any defendant in a class with literally millions of people is certainly not critical . . . . [F]ailure to grant funding in this matter did not render counsel's performance deficient nor did failure to grant funding undermine confidence in the result of the trial.

Id. at 6-9.  The court similarly held that the denial of funds for fingerprint and hair

experts did not render defense counsel ineffective.[28]

The court then concluded that Gary had waived his argument that the lack

of funds had rendered trial counsel constitutionally ineffective:

> In this case ample opportunity was given to this defendant through a
> hearing [to challenge the competence of trial counsel] with counsel of
> his choosing (and additional counsel, if he chose so to avail himself)
> to urge any and all possible errors affecting the trial or prejudicing the

---

[28]  Regarding the fingerprint expert, the court said:

[S]cientific reports were delivered to defense counsel . . . affording ample
opportunity to make any legal or factual investigation required to give this court
any information by way of the evidence or by proffer . . . . [T]he record does not
indicate that any fingerprint witnesses were ever contacted and interviewed prior
to trial . . . . [A]ll experts were uniform in their agreement that the donor was the
defendant, Carlton Gary.  Moreover, at trial the defense never denied that Carlton
Gary was the person who deposited the latent fingerprints in issue.  In his opening
statement [to the jury,] defendant's counsel tacitly admitted that it was Gary who
left the latent fingerprints at the crime scenes.

Order on Remand at 9-10.

After repeating previous statements that it was "impressed with the skill and ingenuity of
counsel," the court stated that "[h]ad there been any possibility of tampering or any other latent
or patent defect in the methods of collecting, maintaining and comparing the fingerprints this
court is confident that such would have been brought to its attention by trial counsel." Id. at 11.

Regarding funds for the employment of a hair expert, the court noted that defense counsel
had not interviewed the Crime Lab experts and said:  "The hair evidence at most included
defendant in that class of persons who could have been the donor of the questioned hair.
Therefore, it was not critical." Id. at 12.  The court noted, moreover, that in his opening
statement to the jury at the outset of the trial, Siemon indicated that a technician from the
Columbus Branch of the Crime Lab would testify that hair samples found at the crime scenes did
not match Gary's hair.  Siemon was wrong.  What the expert said was that Gary could not be
excluded as a potential donor of the hair samples.  Even so, the court specifically found that the
omission of funds for a hair expert "was insufficient to undermine the result of the trial." Id.

32

defendant whether or not the conduct, assistance and aptitude of his trial counsel sank to the constitutional level of ineffectiveness. This defendant refused to accept the opportunities provided him. For reasons probably known only to itself the State elected to go further than even the defendant in the course of the hearing and attempted to elicit from defense counsel August F. Siemon reasons for various avenues of conduct. To each and every material question the defendant asserted his privilege not to have his counsel testify. This is true even though the defendant was made inescapably aware by this court that this was his opportunity to have these possible issues litigated. It is therefore the finding of this court that as to those issues addressed during the hearing on remand that the defendant knowingly, intelligently and voluntarily waived those issues after having been repeatedly advised by the court that his conduct would amount to such a waiver.

Id. at 26-27.

The court concluded its review of the transcripts of pretrial, trial, and remand proceeding with these comments:

In an additional effort to secure for this defendant that which he would not secure for himself this court has reviewed the whole and entire record of the course of litigation in this case. In retrospect this court recognizes that some questioned activity and conduct on the part of counsel was clearly a matter of pretrial strategy and trial tactics. Such conduct delayed the trial of the case and inured automatically to the benefit of the criminal defendant. This is especially true when a case is almost nine years old when it goes to trial. It is now apparent that the course of conduct of defendant's trial counsel throughout as carefully observed by this court was a deliberately planned attempt to create an impression of ineffective assistance, laying the blame solely upon the court's failure to provide funding, and to pave the way for that issue to be raised by way of appeal and habeas corpus. There is no[] doubt that such course received Carlton Gary's full acquiescence.

33

Order at 27-28.

The Georgia Supreme Court reviewed the record of the remand proceeding together with Gary's appeal of his convictions and death sentences. It affirmed Judge Followill's ruling and, finding no merit in any of the pretrial and trial errors asserted in Gary's briefs, affirmed Gary's convictions and death sentences and denied reconsideration. Gary, 389 S.E.2d at 222. As for Gary's claim that the denial of funds caused defense counsel to render ineffective assistance, the court said this:

> [In the remanding proceeding, Gary] refused to waive his attorney-client privilege as to any of his three trial attorneys, and none of them testified on behalf of the defendant. Lead trial attorney Siemon was called as a witness by the state; however, the defendant invoked his attorney-client privilege to prevent his attorney from answering any questions about tactical decisions he made while representing the defendant.

Id. at 220 (emphasis in original).

> In his post-remand brief, the defendant continues to claim, as he did in his original appellate brief, that the trial court's refusal (prior to the original trial) . . . to provide funds for forensic and investigative assistance was an abuse of discretion, *see Isaacs v. State*, 259 Ga. 717 (13)(a), 386 S.E.2d 316 (1989) . . . .
>
> The defendant was given the opportunity to prove that the denial of funds for legal, investigative, and forensic assistance prejudiced his defense; i.e., that because of the trial court's denial of funds, attorney Siemon could not effectively represent his client. The defendant

waived that opportunity, and we need not further address his
contentions in this regard.

Id. at 220-21. Gary sought review of the supreme court's decision in the United

States Supreme Court. The Court denied his petition for a writ of certiorari, Gary

v. Georgia, 498 U.S. 881, 111 S. Ct. 226, 112 L. Ed. 2d 181 (1990)(Mem.), and his

petition for reconsideration, 498 U.S. 994, 111 S. Ct. 543, 112 L. Ed. 2d 552

(1990)(Mem.).

E.

Between 1991 and 1994, Gary filed an initial petition and two amended

petitions for a writ of habeas corpus in the Superior Court of Butts County,

Georgia.[29] The combined petitions contained thirty-two claims for relief, twenty-

nine of which asserted trial court errors that were cognizable on direct appeal but

not on collateral attack in a habeas corpus proceeding. One of these twenty-nine

claims was that the denial of funds to employ a forensic serologist violated the

constitutional right recognized in Ake v. Oklahoma. The three claims not

cognizable on direct appeal, and thus subject to habeas corpus review, were (1)

that Judge Followill denied Gary his counsel of choice, i.e, Derrickson, during the

remand proceeding by appointing two lawyers, Turner and Hoffman, to represent

---

[29] Gary was represented in these proceedings by Vorys, Sater, Seymour & Pease, a
Columbus, Ohio, law firm, and Thomas Dunn and Jeffrey Ertel of the Georgia Resource Center.

35

him, (2) that Gary was denied effective assistance of counsel at trial, on appeal, and during the remand proceeding, and (3) that the prosecution withheld exculpatory evidence – police reports, inconsistent statements of a rape victim who identified Gary as her assailant, and a bite mark exemplar – in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

The ineffective assistance and Brady claims were subjected to evidentiary hearings in the superior court. The ineffectiveness claim alleged that defense counsel rendered ineffective assistance of counsel throughout the prosecution of the case and on direct appeal. The petition cited eighty-nine instances of ineffective assistance of trial counsel in conducting Gary's defense – specifically, in presenting pretrial motions, in handling Gary's special plea of mental incompetency, in dealing with the State's evidence, and in failing to conduct an adequate pretrial investigation into Gary's life and background, resulting in the jury receiving no evidence of mitigating circumstances in the penalty phrase of the trial. The petition cited numerous trial court errors that appellate counsel failed to raise on appeal. It challenged the effectiveness of remand counsel on two theories: first, a conflict of counsel existed due to the relationship between Derrickson and Siemon; second, Derrickson failed to establish the eighty-nine instances of ineffectiveness of trial counsel at the remand hearing.

36

At the evidentiary hearing held on Gary's ineffective assistance claims, Gary's attorneys called no witnesses to show that counsel were ineffective at trial, on appeal, or in the remand proceeding. We can only infer that they rested their case on the record of the trial proceedings, the briefs on appeal, and the record of the remand proceeding. The only evidence bearing on the ineffectiveness issues came from the State. Assistant Attorney General Susan Boleyn called Derrickson to the stand and asked him why, in the remand proceeding, he did not call Gary's trial counsel to testify on the question of ineffectiveness. Derrickson explained his decision not to call Gary's trial counsel, stating, "I thought the Georgia Supreme Court had remanded the case for the purpose of determining – of examining the fund issue from the Sixth Amendment context . . . . I didn't think that there was any purpose in putting on those witnesses." Boleyn then asked him whether he "presented any evidence on the so-called straight forward [sic] ineffectiveness claims, as opposed to funds claims." Derrickson responded that he "didn't think that is what the hearing was about." He conceded, however, "I may have been wrong about that. I certainly – you know, I mean, I certainly have made errors in my life as an attorney." Respondent's Exhibit No. 146 at 467–69.

At the hearing on the Brady claim, habeas counsel introduced forty-one exhibits, but no testimony. Habeas counsel argued that under Brady the

37

prosecution should have turned over as exculpatory: (1) police reports of men the police investigated as possible perpetrators of the crimes alleged in Gary's indictment; (2) inconsistent statements by Gertrude Miller, who identified Gary as the man who raped her after tying her up with a stocking and whose testimony was introduced to establish the defendant's modus operandi; and (3) a plaster exemplar of bite marks left on one of the victims, Janet Cofer, whose rape/murder had been presented at trial as a collateral crime. The State explained that it had not produced the exemplar because it had been misplaced.

In orders entered on January 27 and November 13, 1995, the superior court denied habeas relief. In doing so, it adhered to the Georgia Supreme Court's determination that Gary had waived his ineffective assistance of trial counsel claim by invoking the attorney-client privilege and preventing Siemon, Harvey, and Parker from testifying at the remand proceeding. On the claim that Derrickson had rendered ineffective assistance in the remand proceeding by not calling trial counsel to testify, the court found that Derrickson's decision amounted to a reasonable strategy – it was reasonable for Derrickson to limit his presentation to the "funds issue."

The court rejected each of the Brady allegations. First, it held that the police reports at issue were not exculpatory, as none of the other men investigated

could have committed the rape/murders alleged in the indictment.[30]  Second, it held that the inconsistent statements were merely cumulative of statements Siemon used to impeach Gertrude Miller.  Finally, third, it held that the prosecutor's failure to produce the bite mark exemplar was excusable because the exemplar could not be located, and in the alternative, because the non-disclosure was immaterial.  The court concluded that, "the combined effect of these [materials] does not undermine confidence in the verdict, and there is no reasonable probability that the result of the trial would have been different if these documents were given to the defense at trial."  Respondent's Exhibit No. 161 at 4-5.

Gary applied to Georgia Supreme Court for a certificate of probable cause to appeal.  The court denied his application, and the United States Supreme Court denied certiorari review.  Gary v. Turpin, 520 U.S. 1244, 117 S. Ct. 1852, 137 L. Ed. 2d 1054 (1997)(Mem.), reh'g denied, 521 U.S. 1137, 118 S. Ct. 7, 138 L. Ed. 2d 1040 (1997)(Mem.).

F.

On November 18, 1997, Gary petitioned the United States District Court for the Middle District of Georgia for a writ of habeas corpus pursuant to 28 U.S.C. §

---

[30]  Judge Followill had reviewed these police reports; they were in the investigative file the prosecution turned over to him to examine in camera for Brady material.  He concluded that the reports were not exculpatory, and the habeas court agreed.

2254.[31] He presented 29 claims that, for the most part, mirrored the claims Gary presented in his state habeas petitions. Four of the claims – those set out in the certificate of appealability – are relevant in this appeal.

The first of these claims alleged that the trial court denied defense counsel funds for a forensic serologist in violation of Ake v. Oklahoma. The second alleged the same three Brady claims presented to the state habeas court and further alleged that the prosecution should have turned over the notes and work papers of the GBI Crime Lab experts, which habeas counsel obtained after filing Gary's initial petition in the district court.[32] The third claim alleged that Siemon and Derrickson deprived Gary of his right to the effective assistance of counsel on direct appeal to the Georgia Supreme Court, and the fourth alleged that Derrickson deprived Gary of effective assistance of counsel during the remand proceeding.

The district court held several hearings on Gary's petition, some of which involved the serological evidence – semen and blood – the police had found at

---

[31] Gary's petition presented 29 claims for relief. The claims before us are those set out in the certificate of appealability the district court issued after denying Gary's petition. Gary was represented on federal habeas by John R. Martin and Michael Kennedy McIntyre, both Atlanta lawyers.

[32] Counsel obtained the notes under the Georgia Open Records Act, O.C.G.A. §§ 50-18-70, et seq.

four of the murder scenes.[33]  The evidence had been introduced at trial through the

testimony of a GBI Crime Lab serologist, John Wegel, who testified that Gary may

or may not have been the secretor.  At one of the hearings, the district court

considered the significance of Wegel's notes and work papers.  Habeas counsel

insisted that they could prove that Gary was not the secretor if the court provided

them with funds to employ a forensic serologist to analyze Wegel's notes and

work papers.  The court provided counsel with $2,000 for that purpose.

After counsel obtained the services of a serologist, Roger Morrison, they

requested an evidentiary hearing.  The court granted their request and held a

hearing in which Wegel and Morrison explained and commented on the adequacy

of the tests Wegel conducted in analyzing the semen.  Wegel testified that the

donor of the semen was a weak or non-secretor; Morrison testified that he had

examined Gary's saliva and concluded that Gary was a normal secretor, implying

that he could not have been the source of the semen.  Wegel countered Morrison's

conclusion by stating (1) that secretion levels vary over time and that eighteen

years had passed between the dates the donor deposited the semen and the date of

Morrison's examination, and (2) that secretion levels of semen and saliva may

---

[33]  The semen was found at the scene of the rape/murders of Florence Scheible and
Martha Thurmond, for which Gary had been indicted and convicted, and the rape/murders of
Fern Jackson and Mildred Borom.

differ and that, while Wegel examined semen, Morrison examined saliva. At the conclusion of the hearing, habeas counsel moved the district court for funds to have Gary's semen tested by Morrison and the results of the test introduced into evidence. The court denied the motion.

The district court held two hearings on habeas counsel's allegation that, notwithstanding its representation to the Butts County Superior Court, the State intentionally withheld the bite mark exemplar. Counsel suspected that the exemplar was in the Muscogee County Coroner's Office. The coroner, Dr. Don Kilgore, had died in 2000, so the court issued a subpoena duces tecum to the coroner's widow, Karen Kilgore, and to his two step-daughters, Jeannie Kilgore Hackaday and Joannie Kilgore Warden. The subpoena commanded the family members to appear in court with the exemplar.

None of the family members, however, produced the exemplar when they appeared. Karen Kilgore said that she had seen the exemplar at one of her husband's offices but that she could not recall which one. Jack Warden, Joannie's husband who appeared voluntarily, testified that he might have seen the exemplar and, in any event, he had a good mental picture of it because Dr. Kilgore had described it "in great detail." Joannie Warden testified that she had not seen the exemplar but that she had heard about it from her father. She also said that Henry,

42

her son, told her that Dr. Kilgore had shown him the exemplar before he died. The court then directed that a subpoena duces tecum issue for Joannie's son, Henry, but Henry also failed to produce the exemplar when he appeared. He testified that eight to ten years earlier he had seen the exemplar at his grandfather's house in a box but that he did not know what came of it.

On September 28, 2004, the district court denied Gary's petition on the merits.[34] Gary filed a timely notice of appeal and simultaneously moved the district court for a certificate of appealability. The district court issued the certificate of appealability as to Gary's Ake claim, his Brady claims, his ineffective assistance of counsel claims, and his claim that the habeas court erred in denying him funds to hire a serologist to examine his semen.[35] In their briefs to this court, habeas counsel did not address the ineffective assistance of counsel claims. Accordingly, we deem them abandoned. See Tanner Advertising Group, L.L.C. v. Fayette County, Ga., 451 F.3d 777, 785 (11th Cir. 2006) ("Under the established law of this Circuit, 'issues that clearly are not designated in the initial

---

[34] On August 21, 2002, the district court entered an order dismissing the claims that were procedurally defaulted. In its September 28 order, the court denied on the merits the remaining claims, in addition to the four claims set out above.

[35] Gary moved this court to expand the certificate of appealability. We denied his motion.

43

brief ordinarily are considered abandoned.'") (citing <u>Hartsfield v. Lemacks</u>, 50

F.3d 950, 953 (11th Cir.1995)).[36]

As this appeal was proceeding through the briefing stage, Dr. Kilgore's

successor as Muscogee County Coroner, Dr. James L. Dunnavant, found the

---

[36] It is apparent to us why habeas counsel abandoned the ineffective assistance of counsel claims: the record contained no testimony or other proof that any of Gary's lawyers – Siemon, Harvey, Parker, Jarnigan, or Derrickson – rendered ineffective assistance. One reason for the absence of evidence is that in the remand proceeding – which was the first time an inquiry was made into the quality of counsel's performance – Gary prevented Siemon, Harvey, and Parker from testifying about any material issues.

The first comprehensive allegations of ineffective assistance of counsel were the allegations asserted in Gary's combined petitions for a writ of habeas corpus in the Butts County Superior Court. The petition, as amended, was laden with 89 assertions of ineffective assistance of trial counsel spanning the entire pretrial and trial stages of the case. In addition to alleging that trial counsel were ineffective, the petition alleged that Derrickson was ineffective in not establishing trial counsel's ineffectiveness during the remand proceeding. When the superior court heard the habeas petition, however, Gary's attorneys put on not one witness to establish the petition's assertions. Counsel did not call Siemon, Harvey, Parker, or Derrickson to testify. Habeas counsel could have called them because Gary's habeas allegations that they rendered ineffective assistance of counsel had operated to waive the attorney-client privilege and any claim to work product Gary may have had. Implicit in Gary's habeas petition was the allegation that although the Georgia Supreme Court had held that Gary, in the remand proceeding, had waived his right to challenge trial counsel's effectiveness, the waiver was involuntary – the product of patently incompetent advice from Siemon and Derrickson. In short, all habeas counsel had to go on were the petition's naked allegations that Gary received ineffective assistance of counsel at every stage of the prosecution, including the direct appeal to the Georgia Supreme Court.

Habeas counsel left it to the State to call Derrickson to the stand. When asked by the State why he chose not to call any of Gary's trial counsel to testify, Derrickson said that he thought the supreme court's remand order only concerned the lack of funds issues, that the order did not include the issue of whether trial counsel's performance was ineffective apart from the lack of funds. Derrickson admitted that his reading of the remand order – which explicitly covered the effectiveness of every aspect of trial counsel's performance, whether or not related to the denial of funds – might have been "wrong." When it came time for habeas counsel to question Derrickson on cross-examination, however, they did not show him the order, ask him whether he understood what it stated, and, after he acknowledged that the breadth of the inquiry included trial counsel's overall effectiveness, ask him why he did not summon Siemon, Harvey, or Parker to the witness stand.

missing exemplar in the bottom drawer of a cabinet in his office.  An earlier search

of the Coroner's Office had been unsuccessful.  Accordingly, on November 23,

2005, we remanded the case to the district court so that the court could consider

the significance of this evidence to Gary's defense.  On February 14, 2007, the

district court held a hearing at which the exemplar was introduced.  The court

concluded that the evidence would have played no role in the presentation of

Gary's defense.  Accordingly, the court adhered to its earlier decision denying

Gary habeas corpus relief.

We now address the issues Gary has not abandoned:  first, the Ake claim

that the superior court, during the prosecution of the case, erred by denying Gary's

request for funds to hire a forensic serologist; second, the claim that the district

court, in considering his habeas petition, abused its discretion in denying him

funds to have his semen tested; and, third, the Brady claims that the prosecution

denied Gary a fair trial by withholding evidence favorable to the defense.

## II.

The district court's disposition of a federal constitutional claim under 28

U.S.C. § 2254 is governed by the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA"), Pub. L. No. 104–132, § 104, 110 Stat. 1214, 1218–19 (Apr. 24,

1996), which establishes a "general framework of substantial deference" for

reviewing "every [federal constitutional claim] that the state courts have decided." Diaz v. Sec'y for the Dep't of Corr., 402 F.3d 1136, 1141 (11th Cir. 2005). Unless the Georgia courts' resolution of a constitutional claim is "contrary to, or involved an unreasonable application of, clearly established federal law," as determined by the Supreme Court of the United States, or "based on an unreasonable determination of the facts in light of the evidence presented," the district court is bound not to disturb it on habeas review. Crowe v. Hall, 490 F.3d 840, 844 (11th Cir. 2007) (quoting 28 U.S.C. § 2254(d)). On occasion, the state courts reject a constitutional claim not on the merits but, instead, on an independent state law ground. Under that circumstance, the district court does not reach the merits of the constitutional claim. See Hansbrough v. Latta, 11 F.3d 143, 145 (11th Cir. 1994).

Here, AEDPA mandates that we affirm the district court's denial of Gary's habeas petition as to the first and third issues before us. First, the district court need not have reached the merits of Gary's claim that the trial court denied his request for funds for a forensic serologist in violation of his rights under Ake because the Georgia Supreme Court resolved the denial on the independent state law ground of waiver. Second, the district court acted within its discretion to deny Gary funds to have his semen tested. Third, the district court correctly held that

46

the state habeas court did not misapply clearly established federal law when it rejected Gary's <u>Brady</u> claims.

## III.

## A.

Gary presented his claim that the trial court violated the constitutional mandate set out in <u>Ake v. Oklahoma</u>[37] by denying him funds to employ a serologist to the Georgia Supreme Court on direct appeal. The Georgia Supreme Court assumed, albeit <u>sub silentio</u>, that Gary was entitled to the funds and remanded the case to the trial court with the instruction that the court determine whether the denial of funds caused him prejudice. Gary contended that he was prejudiced because the lack of funds rendered his lawyers, chiefly Siemon, incapable of providing him with constitutionally effective representation. That is,

---

[37] <u>Ake</u> was decided on February 26, 1985. It held that

> when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

<u>Ake</u>, 470 U.S. at 83,105 S. Ct. at 1096.

Siemon filed his brief on direct appeal on December 13, 1986; the Georgia Supreme Court issued the remand order on June 26, 1987. As of the latter date, neither the United States Supreme Court nor this court had extended <u>Ake</u>'s holding to grant an indigent defendant the right to funds for the purposes Siemon and his colleagues were asking – to hire a serologist, a fingerprint analyst, or any other non-psychiatric expert. Accordingly, whether Gary was entitled to funds for the employment of a serologist was a matter of state law, <u>see</u> <u>supra</u> note 23, not federal constitutional law.

47

Gary argued that but for the denial of funds, the outcome of the trial would have been different. The supreme court therefore instructed the trial court to determine whether trial counsel was ineffective for any reason, including the denial of funds. If the trial court found that counsel were ineffective and that such ineffectiveness materially affected the outcome of the trial, Gary would receive a new trial.

On remand, Judge Followill informed Gary that the court could not determine whether the denial of funds had rendered his lawyers ineffective unless the court heard from his lawyers under oath. Gary, however, refused to waive the attorney-client privilege so that the lawyers could testify. Gary's invocation of the privilege applied to all three of his main trial lawyers, Siemon, Harvey and Parker.

Judge Followill took extra steps to ensure that Gary agreed with and understood the consequences of invoking the attorney-client privilege. He stated explicitly that by invoking the privilege Gary would waive his claim to ineffective assistance of counsel. He instructed Derrickson to explain these consequences to Gary and declared a recess so that Derrickson and Gary could confer. After the recess, Derrickson reiterated that Gary would not waive the privilege, and the court confirmed this by speaking directly to Gary and asking him whether he agreed. Gary said that he agreed, but that he could not decide whether to invoke the attorney-client privilege until he heard the specific questions put to Siemon.

48

During Siemon's testimony, the court went so far as to ask Gary, upon each of Derrickson's objections, whether he was sure he wanted to invoke the privilege. He affirmed Derrickson's decisions each time. At the end of the day, the court found that Gary had voluntarily waived his right to claim ineffective assistance of counsel.

Even in the absence of waiver, the court held that the denial of funds for a forensic serologist – the matter we are immediately considering – had no effect on the quality of counsel's performance. Early in the case, the prosecution provided the defense with the Crime Lab reports regarding the serological evidence found at the crime scenes – semen and blood. The reports stated, and Judge Followill found, that the "defendant could not be eliminated as the donor of the serological samples." Respondent's Exhibit No. 78 at 6-9. It was "uncontested . . . that the defendant was included as a possible donor with literally millions of other persons." Id. at 7-8. After receiving these reports, defense counsel spoke to the Crime Lab's Deputy Director, Dr. Byron Dawson, who explained the reports. Dawson invited counsel to visit the Lab and interview the examiners. Siemon, Harvey, and Parker made an appointment to do that, but they canceled the

appointment.[38]  They relied, instead, on the contents of the reports and the

information gained from Dr. Dawson.  Given these circumstances, Judge Followill

assumed that counsel acted prudently in not going further with their investigation

– perhaps because the reports' findings were "certainly not critical" given the

weak nature of the State's evidence. Id. at 8.

------

[38]  At trial, Benny Ray Blakenship, a microanalyst at the Crime Lab called to testify for the State, referred to defense counsel's cancellation of the appointment in the exchange that took place between District Attorney Smith and Blakenship after Siemon attempted to impeach him:

Smith: Did the Defense counsel ever make an appointment with you to discuss this case with you?

Blakenship: Yes, Mr. Gary Parker called and made an appointment.

Smith: Did he or anyone of the Defense, members of the Defense counsel staff, at that time keep the appointment?

Blakenship: No, sir.

Smith: So, you've never spoken with them about this?

Blakenship: No, sir, they didn't return the call.

Smith: Would you have spoken with them if they had come?

Blakenship: Yes, sir, we would have.

Respondent's Exhibit No. 57 at 3867.

On rebuttal, Siemon had no response to the preceding exchange, other than to assert that he, Siemon, had talked with Dr. Byron Dawson, the Deputy Director of the Crime Lab, about the case.  Blakenship testified that he was not sure whether Siemon had indeed talked to Dawson, but he did say that Dawson's signature appeared on the official laboratory reports.

Because Gary invoked his attorney-client privilege, Siemon and his co-counsel did not have to answer for their failure to visit the Crime Lab, interview the examiners, and examine their notes and work papers. Judge Followill found, after reflecting on defense counsel's "pretrial strategy and trial tactics," that counsel

> deliberately . . . attempt[ed] to create an impression of ineffective assistance, laying the blame solely upon the court's failure to provide funding, and to pave the way for that issue to be raised by way of appeal and habeas corpus. There is no[] doubt that such course received Carlton Gary's full acquiescence.

Id. at 27-28. In holding that Gary waived his ineffectiveness claim, the Georgia Supreme Court surely took Judge Followill's findings into account.

We find nothing in the brief Derrickson filed with the supreme court following Judge Followill's decision on remand that took issue with the court's finding that Gary had independently invoked his attorney-client privilege and thereby waived his claim. But even if we were to assume that Derrickson challenged the finding, we find nothing in the record before the supreme court that would provide a basis for saying that the court lacked a firm foundation in the evidence for rejecting Gary's Ake claim on the independent state ground of waiver. We therefore resolve the first issue against the petitioner.

B.

51

Gary asks that we vacate the district court's judgment and remand the case for further consideration on the ground that the district court abused its discretion in denying him funds to have his semen tested. The question of whether the court should have provided such funds arose because the district court, after agreeing with the Georgia Supreme Court that Gary had waived his claim for funds, decided to take the case one step further and consider, as an alternative issue, whether Ake v. Oklahoma required the trial court to grant Gary's request for funds to hire a forensic serologist.[39]

Ake held that an indigent defendant is entitled to expert psychiatric assistance. The district court assumed that Ake informed the trial court's decision whether or not to grant Gary's request for serologist funding, drawing on our decision in Conklin v. Schofield, 366 F.3d 1191, 1206 (11th Cir. 2004), in which we suggested, but did not specifically hold, that the "due process clause could require the government to provide non-psychiatric expert assistance to an indigent defendant upon a sufficient showing of need." The district court then held that the trial court was unreasonable in denying the request because it was apparent that

___

[39] The court was prompted to entertain this alternative issue because habeas counsel had recently acquired the notes and work sheets of the Crime Lab experts who examined the serological materials the police had found at the crime scenes. Defense counsel did not have these notes and work sheets in their possession when they moved the trial court for the provision of funds.

defense counsel needed a serologist to question the State's expert about his serological fluid findings. Gary, 336 F. Supp. 2d at 1361. Nonetheless, the district court held that, since the State's expert's serological testimony was inconclusive, the presence of a competing defense expert would not likely have altered alter the outcome of the trial, and the denial of funds did not render Gary's trial fundamentally unfair. Id. at 1362. Gary argues that the district court should not have ruled until it provided funds for the testing of his semen and, if necessary, received the results of the test.

The flaw in Gary's argument is that Ake had no bearing on the state trial court's decision of whether to grant defense counsel's request for funds. That is, the court's decision to deny the funds could not have been "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The Supreme Court has instructed that a state court decision is "contrary to" established federal law if it "applies a rule that contradicts the governing law set forth in our cases." Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L. Ed. 2d 389 (2000) (O'Connor, J.). "[C]learly established Federal law" consists of the"holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id. at 412, 120 S. Ct. at 1523. The

relevant law is the federal law that exists on the date the petitioner's convictions become final. See Schwab v. Crosby, 451 F.3d 1308, 1324 (11th Cir. 2006).[40] A conviction becomes final "when the availability of direct appeal to the state courts has been exhausted and . . . a timely filed petition [for a writ of certiorari] has been finally denied." Caspari v. Bohlen, 510 U.S. 383, 390, 114 S. Ct. 948, 953, 127 L. Ed. 2d 236 (1994). A Supreme Court decision, which is not dictated by precedent or is not made retroactive to cases on collateral review, handed down after the petitioner's conviction becomes final does not control the disposition of the petitioner's habeas proceeding. Newland v. Hall, 527 F.3d 1162, 1196-1201 (11th Cir. 2008).

As the district court correctly acknowledged, at the time Gary's conviction became final on August 4, 1997, the Supreme Court had not extended Ake's holding beyond the provision of psychiatric assistance. Accordingly, the state trial court was not bound as a matter of federal constitutional law to apply Ake in ruling on defense counsel's request for funds to hire a forensic serologist. Rather, the request was governed by state law and committed to the trial court's discretion.

_____

[40] In contrast, the relevant state court decision disposing of Gary's Brady claims is the date the United States Supreme Court denied reconsideration of his petition for a writ of certiorari to review the Georgia Supreme Court's denial of Gary's application for a certificate of probable cause to appeal the Butts County Superior Court's denial of his petition for a writ of habeas corpus.

In sum, Gary's denial-of-funds claim did not present a federal constitutional question, and the district court should not have entertained it.

C.

Gary contends that his convictions should be set aside because the State withheld exculpatory evidence in violation of <u>Brady</u>. He relies on the three alleged <u>Brady</u> violations that he asserted in his state habeas petition and two additional violations that were discovered after he filed his petition in the district court. In his two new claims, Gary alleges that the state should have turned over the notes and work papers of the Crime Lab experts who examined the serologic fluid the police found at some of the crime scenes and the plaster exemplar of the bite mark that the Muscogee County Coroner discovered on one of Janet Cofer's breasts.

The Butts County Superior Court found nothing exculpatory in the forty-one exhibits that purportedly contained <u>Brady</u> material, and the district court agreed, holding that the superior court's rulings were neither contrary to or an unreasonable application of Supreme Court precedent, nor based on an unreasonable resolution of the factual issues. <u>Gary</u>, 336 F. Supp. 2d at 1363-73. Since the superior court did not have an opportunity to consider the prejudice, if any, Gary may have suffered because his trial counsel has not seen the Crime Lab

55

notes and work sheets, the district court considered <u>de novo</u> the prejudice that happenstance may have caused. The court found that the State's failure to provide counsel with those items did not deny Gary due process because their contents were not material; there was not "a reasonable probability that, had the [notes and] worksheets been disclosed to the defense, the result of the proceeding would have been different." <u>Id.</u> at 1373 (internal quotations and brackets omitted).[41]

The district court held an evidentiary hearing to determine whether the bite mark exemplar qualified as <u>Brady</u> material. After listening to the testimony of seven of the petitioner's witnesses and receiving twelve exhibits, the court concluded that the State's failure to disclose the exemplar did not alter its previous decision to deny the writ. The court indulged the assumption that, if armed with the exemplar, defense counsel, with the assistance of a forensic odontologist, could have, at the very least, cast doubt on whether the bite marks were Gary's. Nonetheless, the court concluded that the unavailability of the bite mark exemplar "d[id] not undermine confidence in the verdict and sentence determined by the jury." <u>Gary v. Schofield</u>, 493 F. Supp. 2d 1255, 1264 (M.D.Ga. 2007).

_____

[41] The district court concluded that the notes and worksheets were immaterial because the trial testimony established, and the State conceded, that the findings of the serological tests were inconclusive. Given this, even if Gary had access to these documents prior to or at trial, he would not have been able "to put the whole case in such a different light as to undermine confidence in the verdict." <u>Gary</u>, 336 F. Supp. 2d at 1373 (quoting <u>Kyles v. Whitley</u>, 514 U.S. 419, 435, 115 S. Ct. 1555, 1566, 131 L. Ed. 2d 490 (1995)).

To establish a <u>Brady</u> violation, a petitioner must show that: (1) the prosecution possessed evidence favorable to the accused, because it was either exculpatory or impeaching, and did not disclose it to the defense; (2) the State suppressed the evidence such that the defense did not otherwise possess the evidence and could not reasonably have obtained it; and (3) the evidence was material, and its absence yielded prejudice. <u>See, e.g., Kelley v. Sec'y for the Dep't of Corr.</u>, 377 F.3d 1317, 1354 (11th Cir. 2004); <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286 (1999). Evidence is material so as to establish prejudice only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>United States v. Bagley</u>, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481 (1985).

Gary argues that he has made a sufficient showing that a "reasonable probability" exists that, if he had the withheld evidence at trial, "the result of the proceeding would have been different." The district court disagreed. We review the district court's decisions as to the Crime Lab items and the bite mark exemplar, which the court reached after conducting a bench trial, by examining the court's

findings of fact for clear error and the court's conclusions of law de novo.[42] See, e.g., Mitchell v. Hillsborough County, 468 F.3d 1276, 1282 (11th Cir. 2006) (noting that, after a bench trial, the court of appeals reviews legal conclusions *de novo* and findings of fact for clear error); Moon v. Head, 285 F.3d 1301, 1311 (11th Cir. 2002) (reviewing de novo determination of the materiality of a Brady violation).[43] We review the district court's disposition of the remaining Brady claims *de novo*, by determining whether the Butts County Superior Court, in denying those claims, misapplied Supreme Court precedent or unreasonably determined the material facts. See 28 U.S.C. § 2254(d). We have carefully considered the superior court's disposition of those claims and conclude, as the district court did, that they are not the product of a misapplication of Supreme Court precedent or faulty fact finding. Having said that, we turn to the two claims the district court tried, the State's failure to disclose the Crime Lab notes and work sheets and the bite mark exemplar.

---

[42] The district court held a bench trial on these two Brady claims. Although this is a habeas case, the standard of review – as set out in the above text – is the same as it is in any other case tried to the bench.

[43] We review the district court's decisions not to disturb the Butts County Superior Court's Brady claim rulings as if we were standing in the district court's shoes and asking whether the superior court's rulings were "contrary to, or involved an unreasonable application of, clearly established Federal law" or were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

We reject the notes and work sheets claim out of hand. Despite habeas counsel's argument to the contrary, Gary's trial counsel always had access to the Crime Lab experts' notes and work sheets. As Judge Followill stated in the order he entered following the remand proceeding, Siemon, Harvey, and Parker had arranged to meet the Crime Lab experts, but they canceled the appointment, choosing instead to rely on the Crime Lab reports and what they had learned from the Lab's Deputy Director. At the trial, when John Wegel, the Crime Lab's serologist, took the stand to testify, he had his notes and work sheets with him to refresh his recollection.[44] Siemon, as he stood to commence his cross-examination, chose not to ask Wegel what he had used to refresh his recollection. During cross-examination, Siemon attempted to impeach Wegel with the Crime Lab reports, but he never took the next step to ask Wegel for his notes and work sheets, which were readily available. We are aware of no precedent – and habeas counsel has cited none – finding a Brady violation under these circumstances. The claim Gary presents is patently frivolous.

---

[44] Wegel had examined the serological evidence obtained from the crime scenes in 1977 and 1978, shortly after the rape/murders had been committed. His trial testimony took place on August 15, 1986, over eight years later. Due to this passage of time, he could not testify without reading his notes and work sheets to refresh his recollection.

As for the bite mark exemplar, we have recited what led to its eventual disclosure. We now examine why, according to the State, the exemplar was not shown to the defense prior to trial. The exemplar was created after the body of rape and murder victim Janet Cofer was discovered on April 19, 1978.[45] Dr. Joe Weber, a Crime Lab pathologist, while assisting Coroner Kilgore in performing an autopsy of the body the same day, observed "what appeared to be tooth marks" on the left breast. He consulted an odontologist, Dr. Carlos Galbreath, and Galbreath created an impression of the bite marks with rubber gel and a syringe. After the gel hardened, Galbreath made an exemplar of the bite mark impression, the standard procedure in dentistry for creating a permanent mold of impressions of teeth. The exemplar was stored in the Coroner's Office until July 6, 1984, when the Columbus Police Department took possession of the exemplar after Gary was taken into custody.

Shortly after Gary's indictment, the prosecutors took the exemplar to a forensic dentist, Dr. Thomas David. He examined the exemplar and concluded that no reliable comparison could be made between the exemplar and Gary's teeth because Gary had undergone dental work since the last of the rape/murders. The

---

[45] As indicated, supra, the Cofer rape/murder was not charged in Gary's indictment. The episode was introduced into evidence to establish modus operandi and identity.

60

prosecutors accepted Dr. David's opinion and decided against introducing the bite mark exemplar as evidence at Gary's trial. Hence, they returned the exemplar to the Coroner's Office. Although Gary's trial counsel had read the report of the Cofer autopsy and thus knew of the bite mark, they were not aware that an exemplar of the bite mark had been made or that the prosecutors were privy to Dr. David's opinion that no reliable comparison could be made between Gary's teeth and the bite mark.

Given this, it is clear that the State, i.e., the Coroner's Office, had the bite mark exemplar and that, even with reasonable diligence, defense counsel could not have obtained it. The record is unclear, however, as to whether the exemplar constituted exculpatory evidence, given the dental work Gary underwent between the time of the Cofer rape/murder and his arrest and prosecution. Moreover, it is unlikely that Gary has shown a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682, 105 S. Ct. at 3383. Even if Gary had access to the exemplar at trial, he could only have shown that the bite marks were inconclusive; because of the intervening dental work, any bite mark comparison would neither identify nor exclude him as the perpetrator of the Cofer crime. The jury, in fact, actually heard evidence that the bite marks were inconclusive. Dr. Weber, the

State's pathologist, testified that the marks neither conclusively proved or disproved that Gary was the perpetrator. Taken in context with the other evidence, including Gary's confession that he was at the Cofer residence when she was murdered, there exists no "reasonable probability" that the admission of an inconclusive bite mark exemplar would have changed the outcome of the proceeding.

In conducting our Brady analysis, we are mindful that we must consider the cumulative impact of the suppressed evidence. That is, we need to consider the cumulative effect of the bite mark exemplar, and the expert testimony its disclosure may have engendered, in conjunction with all other exculpatory evidence the prosecution did not disclose. Even when we do so, we cannot say that the combined effect of this evidence undermines confidence in the jury's verdicts at the conclusion of the guilt or penalty phases of the trial. In this regard, we mention once again the probative evidence that linked Gary to the crimes in this case. Specifically, Gary confessed that he was present at, or had knowledge of, eight of the nine 1977-78 rape/murders portrayed to the jury. Although he tried to blame these crimes on a boyhood friend, Malvin A. Crittenden, the police found no evidence to corroborate his assertion. Nor were the police able to locate anyone else who may have been with Gary on those occasions. While the hair

evidence was inconclusive – Gary was neither included nor excluded in the class of potential perpetrators – his fingerprints were found to match the latent prints found at four of the crime scenes. In sum, considering all the evidence the State withheld from the defense, allegedly in violation of the <u>Brady</u> rule, we could not say that confidence in the jury's verdicts following the guilt or penalty phases of the trial is undermined, for there is no reasonable probability that the verdicts would have been different had the jury received the evidence at issue.

IV.

We have thoroughly considered the issues set out in the certificate of appealability and find no cause for reversal. The judgment of the district court is, accordingly,

AFFIRMED.