TJOFLAT, Circuit Judge:
A state prisoner under a sentence of death, who petitions a United States District Court pursuant to 28 U.S.C. § 2254, for a writ of habeas corpus, is entitled to the appointment of one or more attorneys if he is “financially unable to obtain adequate representation.” 18 U.S.C. § 3599(a)(2).[1] “[E]ach attorney so appointed shall represent the [prisoner] throughout every subsequent stage of available judicial proceedings,” which includes “all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures,” as well as “proceedings for executive or other clemency as may be available.” Id. § 3599(e).[2] In addition, if the District Court “findfs] that investigative, expert, or other services are reasonably necessary for the representation of the [prisoner], whether in connection with issues relating to guilt or the sentence, the court may authorize the [prisoner’s] attorneys to obtain such services on behalf of the [prisoner] and, if so authorized, shall *1263 order the payment of fees and expenses.” Id. § 3599(f)-(g).[3]
In this case, Carlton Gary is a Georgia prisoner on death row. Gary received the appointment of two attorneys under § 3599(a)(2) to prosecute his petition for a writ of habeas corpus in the United States District Court for the Middle District of Georgia.[4] After the writ was denied, and before Gary’s execution was to take place, the same attorneys represented Gary at a clemency hearing before the Georgia Board of Pardons and Paroles (the “Board”). Clemency was denied, but the Georgia Supreme Court stayed Gary’s execution to enable him to pursue a motion for deoxyribonucleic acid (“DNA”) testing in the court in which he was convicted and sentenced, the Superior Court for Muscogee County (the “DNA.motion”),[5] and, depending on the outcome of the DNA mo *1264 tion, an extraordinary motion for a new trial under the authority of O.C.G.A. §§ 5-5-40 and 5-5-41.[6] The Superior Court granted Gary’s DNA motion. The testing proceeded and yielded DNA evidence. Based upon this “newly discovered DNA evidence,” Gary began preparation of an extraordinary motion for new trial. The attorneys appointed pursuant to § 3599(a)(2) to represent Gary in the District Court and at the clemency hearing prosecuted the DNA motion and are preparing, and intend to prosecute, his extraordinary motion for a new trial.
In these three appeals, Gary challenges three orders. Appeal No. 09-16198 arises from the District Court’s denial of a motion for funds to pay two experts to appear in person at Gary’s clemency hearing, Dr. Thomas David and Mr. Roger Morrison; Appeal No. 11-10705 involves the District Court’s partial denial of a voucher submitted by Gary’s counsel for payment of services rendered in pursuing the extraordinary motion for a new trial; and Appeal No. 11-15396 addresses the District Court’s denial of a motion for funds to pay an expert, Dr. Greg Hampikian, to assist Gary’s attorneys in connection with the DNA motion.
To address these appeals, it is necessary to briefly recall the criminal conduct that led to Gary’s death-row status and the rulings the District Court made in denying Gary’s petition for a writ of habeas corpus, for they provide the background against which the District Court made the decisions Gary challenges.
I.
A.
Carlton Gary was convicted by a jury in Muscogee County on August 27, 1986, on three counts each of murder, rape, and burglary.[7] He was sentenced to death on each of the murder counts. The Georgia Supreme Court, in affirming his convictions and death sentence, described what led to the convictions:
Police had no viable suspects in the case until 1984, when a gun stolen from the *1265 Wynton area in 1977 was discovered in Michigan — a consequence of that state’s gun registration laws — in the possession of Carlton Gary’s cousin. After further investigation, Gary was arrested for burglary on May 3, 1984. His fingerprints matched those taken from the scenes of four of the murders.
Gary admitted to law enforcement officers that he was present at seven of the crime scenes (the eighth he could not remember), but claimed he was only a burglar. He blamed the murders on another[, a boyhood friend, Malvin Crittenden]. Further investigation revealed that in other instances in New York and in South Carolina, Gary had committed violent crimes and blamed others. For example, he raped and murdered an 89 year old woman in her home in Albany, New York in 1970. His fingerprints were found at the crime scene. Gary claimed one John Mitchell committed the murder. Mitchell, however, was acquitted by a jury. In another New York crime involving rape and burglary, Gary admitted only to being a “lookout” and blamed the rape on another. In all these cases, no evidence other than Gary’s own statements and testimony supported his claim that another person was involved in the crime with him.
Gary v. State, 260 Ga. 38, 389 S.E.2d 218, 219-20 (1990).[8]
B.
After the United States Supreme Court denied his petition for a writ of certiorari, Gary v. Georgia, 498 U.S. 881, 111 S.Ct. 226, 112 L.Ed.2d 181 (1990), and the Georgia courts denied him habeas corpus relief,[9] Gary petitioned the United States District Court for the Middle District of Georgia for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Two of the claims Gary presented in his habeas petition are germane here. One was that the Georgia Supreme Court misapplied Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), in affirming the trial court’s denial of his request for funds to hire a forensic serologist; the other was that the Georgia Supreme Court erred, under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in finding that the State’s failure to produce pretrial a bite-mark exemplar made from tooth marks on one of the victim’s breasts was not material to the defendant’s guilt. Gary v. Hall, 558 F.3d 1229, 1248^9 (11th Cir.2009). Gary argued that he needed a forensic serologist to show that he could not have been the source of the semen found at the scenes of two of the murders for which he had been convicted and two of the murders that had been introduced as collateral, uncharged crimes. Similarly, he needed the bite-mark exemplar to show that the marks on another victim’s breast — the victim of one of the four uncharged crimes — were not his.[10]
*1266 The district court held ... hearings on Gary’s [request for a forensic serologist], some of which involved the serological evidence — semen and blood — the police had found at four of the murder scenes. The evidence had been introduced at trial through the testimony of a GBI Crime Lab serologist, John Wegel, who testified that Gary may or may not have been the secretor. At one of the hearings, the district court considered the significance of Wegel’s notes and work papers. Habeas counsel insisted that they could prove that Gary was not the secretor if the court provided them with funds to employ a forensic serologist to analyze Wegel’s notes and work papers. The court provided counsel with $2,000 for that purpose.
After counsel obtained the services of a serologist, Roger Morrison, they requested an evidentiary hearing. The court granted their request and held a hearing in which Wegel and Morrison explained and commented on the adequacy of the tests Wegel conducted in analyzing the semen. Wegel testified that the donor of the semen was a weak or non-secretor; Morrison testified that he had examined Gary’s saliva and concluded that Gary was a normal secretor, implying that he could not have been the source of the semen. Wegel countered Morrison’s conclusion by stating (1) that secretion levels vary over time and that eighteen years had passed between the dates the donor deposited the semen and the date of Morrison’s examination, and (2) that secretion levels of semen and saliva may differ and that, while Wegel examined semen, Morrison examined saliva. At the conclusion of the hearing, habeas counsel moved the district court for funds to have Gary’s semen tested by Morrison and the results of the test introduced into evidence. The court denied the motion.
Gary, 558 F.3d at 1248-49 (internal footnote omitted). We affirmed. Id. at 1254.
The District Court held an evidentiary hearing on Gary’s bite-mark claim. “The court indulged the assumption that, if armed with the exemplar, defense counsel, with the assistance of a forensic odontologist, could have, at the very least, cast doubt on whether the bite marks were Gary’s.” Id. at 1256-57. Nonetheless, the court concluded that the unavailability of the bite mark exemplar “d[id] not undermine confidence in the verdict and sentence determined by the jury,” id. (internal citation omitted), and thus denied the claim. We affirmed the court’s denial of the claim. Gary, 558 F.3d at 1248-49. Our reasons for doing so no doubt informed, at least in part, the District Court’s exercise of discretion in denying Gary’s request that the District Court provide him with funds to present the expert testimony of Dr. Thomas David at his clemency hearing.
As for the bite mark exemplar, we ... examine why, according to the State, the exemplar was not shown to the defense prior to trial. The exemplar was created after the body of rape and murder victim Janet Cofer was discovered on April 19, 1978. Dr. Joe Weber, a Crime Lab pathologist, while assisting Coroner Kilgore in performing an autopsy of the body the same day, observed “what appeared to be tooth marks” on the left breast. He consulted an odontologist, Dr. Carlos Galbreath, and Galbreath created an impression of the bite marks with rubber gel and a syringe. After the gel hardened, Galbreath made an exemplar of the bite mark impression, the standard procedure in dentistry for creating a permanent mold of impressions of teeth. The exemplar was stored in the Coroner’s Office until July 6, 1984, when the Columbus Police Department took possession of the exemplar after Gary was taken into custody.
*1267 Shortly after Gary’s indictment, the prosecutors took the exemplar to a forensic dentist, Dr. Thomas David. He examined the exemplar and concluded that no reliable comparison could be made between the exemplar and Gary’s teeth because Gary had undergone dental work since the last of the rape/murders. The prosecutors accepted Dr. David’s opinion and decided against introducing the bite mark exemplar as evidence at Gary’s trial. Hence, they returned the exemplar to the Coroner’s Office. Although Gary’s trial counsel had read the report of the Cofer autopsy and thus knew of the bite mark, they were not aware that an exemplar of the bite mark had been made or that the prosecutors were privy to Dr. David’s opinion that no reliable comparison could be made between Gary’s teeth and the bite mark.
Given this, it is clear that the State, i.e., the Coroner’s Office, had the bite mark exemplar and that, even with reasonable diligence, defense counsel could not have obtained it. The record is unclear, however, as to whether the exemplar constituted exculpatory evidence, given the dental work Gary underwent between the time of the Cofer rape/murder and his arrest and prosecution. Moreover, it is unlikely that Gary has shown a “reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” [United States v.] Bagley, 473 U.S. [667,] 682, 105 S.Ct. [3375,] 3383[, 87 L.Ed.2d 481 (1985)]. Even if Gary had access to the exemplar at trial, he could only have shown that the bite marks were inconclusive; because of the intervening dental work, any bite mark comparison would neither identify nor exclude him as the perpetrator of the Cofer crime. The jury, in fact, actually heard evidence that the bite marks were inconclusive. Dr. Weber, the State’s pathologist, testified that the marks neither conclusively proved or disproved that Gary was the perpetrator. Taken in context with the other evidence, including Gary’s confession that he was at the Cofer residence when she was murdered, there exists no “reasonable probability” that the admission of an inconclusive bite mark exemplar would have changed the outcome of the proceeding.
Gary, 558 F.3d at 1256-57.
C.
This brings us to the appeals at hand. We consider them in turn, starting with Appeal No. 09-16198.
II.
A.
On November 30, 2009, the United States Supreme Court denied Gary’s petition to review this court’s decision affirming the District Court’s denial of habeas relief.[11] A few days later, the State scheduled Gary’s execution for December 16, 2009, and the Board scheduled a clemency hearing for December 14, 2009.
On December 9, 2009, Gary moved the District Court for the provision of funds for two experts to appear in person at the clemency hearing, Dr. Thomas David and Roger Morrison. His attorneys would be representing him at the clemency hearing (pursuant to their § 3599(e) appointment), and, according to his motion, the live opinion testimony of these experts was, within the intendment of § 3599(f), “reasonably *1268 necessary” to enable the attorneys to provide effective assistance of counsel at the hearing. 18 U.S.C. § 3599(f).
Gary asserted that the funds were “reasonably necessary” because Dr. David’s and Roger Morrison’s opinions would likely create doubt- as to his guilt. He asked for $500 to enable Dr. David to appear and opine that a comparison of the bite mark exemplar 'taken from victim Cofer’s left breast to an exemplar of Gary’s teeth made it “more likely than not” that Gary was not “the person who ... left [the] bite mark on Ms. Cofer’s breast.” Gary sought $2,000 to have Morrison testify to the testing of semen samples found on other victims. Morrison would opine that, based on a comparison of Gary’s saliva to the semen samples, Gary could not have been the secretor of the semen. Gary concluded his motion by stating that, in denying his § 2254 petition for habeas corpus relief, “this Court may have disagreed with or minimized the conclusions of [the two experts], but [their] testimony is nevertheless important for the [Board] to make its independent and quite different decision.”[12]
The District Court denied Gary’s motion, concluding that Gary simply wanted to relitigate in another forum the precise issues the court had rejected previously. Indeed, Gary admitted as much; he merely wanted the Board to conduct an “independent” review of the evidence the District Court had considered, hoping that the Board would reach a “quite different decision.” Thus, given that Gary merely wanted to relitigate two of his habeas claims, the court found that the appearance of the two experts in person before the Board was not “reasonably necessary.” He could present the Board with the transcriptions of the testimony the experts had presented in the hearings held on his § 2254 petition. Gary immediately appealed the court’s ruling; meanwhile, the experts appeared at the clemency hearing on December 14.[13]
B.
Gary argues that the District Court abused its discretion in denying the requested funds on the ground that he wanted to relitigate the bite mark and semen issues before the Board.[14] Raising doubt as to one’s guilt, he submits, is not inappropriate at a clemency hearing. Therefore, the experts’ appearance was “reasonably necessary” to effectively present that argument.
We have interpreted the § 3599(f) phrase “reasonably necessary” to mean the same as showing a “ ‘substantial need’ for the requested assistance.” Brown, 441 F.3d 1330, 1364 (11th Cir.2006) (quoting Riley v. Dretke, 362 F.3d 302, 307 (5th Cir.2004)). Gary contends that requiring the Board to rely on the transcripts of the testimony the experts gave during the § 2254 proceedings would prevent the Board from reaching a fully informed decision. Live testimony was needed to determine “whether there [we]re sufficient doubts about [his] guilt” that would justify a commutation of his sentence. The witnesses needed to appear in person so that the Board could “judge [their] credibility” *1269 and “ask questions regarding what are sometimes complicated and difficult to understand issues.”
The problems Gary raises are not significant, nor are they unique to a clemency proceeding. The decisions of courts and adjudicative bodies are frequently made on cold records. Thus, the mere fact that the Board might have been better able to assess the credibility of Gary’s experts if they appeared in person did not mean that their appearances were per se “reasonably necessary,” and that testimony they previously gave under oath in an adversary proceeding before the District Court would not suffice.[15] Indeed, the Board itself, through regulations it has promulgated, has recognized the fact that live testimony is not essential to its consideration of a clemency application. Under its regulations, the Board may decide not to hold a clemency hearing at all, and may consider an application for commutation on the paper record alone. See Ga. Comp. R. & Regs. § 475 — 3—.10(2)(b).
We find no abuse of discretion here. It is apparent from Gary’s submissions to the District Court, and to this court on appeal, that the opinions Dr. David and Morrison would express at the clemency hearing were simply a reiteration of the opinions they gave before the District Court.[16] In sum, we conclude that the District Court did not abuse its discretion in concluding that Gary failed to show that the experts’ personal appearances before the Board were “reasonably necessary” to enable his attorneys to adequately to represent him before the Board. The District Court’s decision denying the requested funds is accordingly affirmed.
III.
Appeal No. 11-10705 arises from the denial of a “CJA 30 Death Penalty Proceedings” fee voucher (“CJA 30” voucher) Gary’s appointed counsel submitted to the District Court on December 1, 2010.[17] The District Court, in an order issued on December 10, 2010, authorized *1270 payment for 12.3 hours of work performed in connection with Gary’s clemency hearing,[18] but denied payment for 16.9 hours spent researching, drafting, and revising an extraordinary motion for a new trial based on the DNA motion. Gary moved the District Court to reconsider its denial of payment for the 16.9 hours of work. The motion was denied in an order entered on January 21, 2011. Gary appeals that order.
We first must ask whether we have jurisdiction to hear this appeal. Ray v. Edwards, 725 F.2d 655, 658 n. 3 (11th Cir.1984) (stating that “[t]his court has a duty to review its jurisdiction of an appeal”). Our jurisdiction, if any, must be based on the provisions of 28 U.S.C. §§ 1291 or 1292. Section 1292 is plainly inapplicable. See 28 U.S.C. § 1292 (authorizing review of interlocutory decisions, decisions related to injunctions, receiverships or admiralty matters, and issues certified for appeal). Accordingly, if we have jurisdiction, it must lie under § 1291. Section 1291 gives the courts of appeals “jurisdiction of appeals from all final decisions of the district courts.” 28 U.S.C. § 1291. The question, therefore, is whether the District Court’s January 21, 2011, order is a final decision.
In United States v. Rodriguez, 833 F.2d 1536, 1537-38 (11th Cir.1987), we concluded that a district court’s decision denying an appointed attorney’s application for compensation under the Criminal Justice Act (“CJA”), 18 U.S.C. § 3006A(d) was not a final decision reviewable under § 1291.[19] We believe that Rodriguez applies with equal force to an appointed attorney’s application for compensation under § 3599(e) for several reasons. First, the procedure to approve compensation set out by each statute is essentially a mirror image of the other. Each statute gives the district court the initial and primary responsibility for appointing counsel for indigent defendants or habeas petitioners and determining the compensation counsel is to receive. Moreover, both statutes require “the chief judge of the circuit” to approve compensation in excess of the statutory limits.[20] Compare 18 U.S.C. § 3006A(d)(3) (outlining process for authorization of attorneys fees in excess of statutory cap) with 18 U.S.C. § 3599(g)(2) (describing process for authorization of expert fees in excess of statutory maximum). Second, the text and legislative history of both statutes omits any provision for the appeal of an order *1271 approving or disapproving the payment of attorney’s fees. Third, the District Court’s ruling under both statutes is made in an administrative, not a judicial context. Judicial decisions are rendered in an adversary proceeding. In contrast, a decision approving or disapproving a fee voucher is made without notice to any other interested party, for the court’s disposition of the voucher does not turn on the outcome of the litigation between the parties. The controversy, if one exists, is between the dissatisfied attorney and the District Court.
In sum, we conclude that a District Court’s partial denial of a CJA fee voucher is not a final decision for the purposes of § 1291. Appeal No. 11-10705 must be dismissed for lack of appellate jurisdiction.[21]
*1272 rv.
We now address Appeal No. 11-15396. Gary moved the Superior Court of Muscogee County, pursuant to O.C.G.A. § 5-5-41(c), to order DNA testing of vaginal contents or vaginal washings obtained from some of the victims.[22] On February 19, 2010, the Superior Court ordered limited DNA testing of samples taken from three victims.[23] On May 24, 2010, Gary asked the District Court to provide funds pursuant to § 3599(f) for a DNA expert, Dr. Greg Hampikian, to assist counsel in moving the Superior Court to order additional DNA testing. On June 4, 2010, the District Court entered an order providing funds not to exceed $7,500 to pay Dr. Hampikian. On August 19, 2011, Gary asked the District Court to provide an additional $3,500 for Dr. Hampikian in anticipation of the Superior Court’s authorization of another round of DNA testing.[24] The District Court denied this request. The court concluded that, in light of the Supreme Court’s decision in Harbison v. Bell, 556 U.S. 180, 129 S.Ct. 1481, 173 L.Ed.2d 347 (2009), the DNA testing ordered by the Superior Court pursuant to O.C.G.A. § 5-5-41(c) was not a post-conviction process covered by § 3599(e), even though Gary filed the motion subsequent to the initiation of his § 2254 case. Thus, since the DNA Motion was outside the scope of Gary’s lawyers’ § 3599(a)(2) appointment, the lawyers could not obtain funds pursuant to § 3599(f) for Dr. Hampikian’s services.[25]
Gary appeals the District Court’s decision, arguing that the denial of funds for the expert denies him the effective assistance of counsel in obtaining the DNA testing in the Superior Court of Muscogee County, a post-conviction proceeding he claims is within the intendment of § 3599. We have jurisdiction to entertain his appeal.[26] We review the District Court’s in *1273 terpretation of § 3599 de novo. See United States v. Dodge, 597 F.3d 1347, 1350 (11th Cir.2010) (en banc).
A.
As in all cases involving the interpretation of a statute, we begin with the language employed by Congress. See Hardt v. Reliance Standard Life Ins. Co., 560 U.S. -, 130 S.Ct. 2149, 2156, 176 L.Ed.2d 998 (2010). Here, the language of the statute is indeed broad. Section 3599 authorizes the appointment of counsel for an indigent prisoner who seeks a writ of habeas corpus setting aside a death sentence, see 18 U.S.C. § 3599(a)(2), and requires that counsel continue to represent the prisoner “throughout every subsequent stage of available judicial proceedings,” including “all available post-conviction process,” id. § 3599(e) (emphasis added).
The Supreme Court had occasion to interpret this statute in Harbison v. Bell. In Harbison, the Court said that § 3599 provides indigent defendants with “federally appointed counsel to represent their clients in state clemency proceedings and entitles them to compensation for that representation.” 556 U.S. at 194, 129 S.Ct. at 1491. Significantly, however, the Court read the language of § 3599 to limit the right to federally-funded representation in several important ways.[27] The Court found that the language of § 3599(e) listed responsibilities of appointed counsel sequentially, concluding that an indigent prisoner is entitled to counsel’s representation only for those judicial proceedings that ordinarily occur subsequent to counsel’s appointment. Id. at 188, 129 S.Ct. at 1488. The Court reasoned
when [counsel] is appointed pursuant to (a)(2), [counsel’s] representation begins with the § 2254 or § 2255 “post-conviction process.” Thus, counsel’s representation includes only those judicial proceedings transpiring “subsequent” to *1274 her appointment. It is the sequential organization of the statute and the term “subsequent” that circumscribe counsel’s representation ....
Id. For counsel appointed to represent an indigent § 2254 petitioner, such as Gary, the relevant starting point is the filing of the habeas petition — an indigent petitioner standing in Gary’s shoes may receive § 3599 funding only for those proceedings that ordinarily occur subsequent to that starting point.
Elaborating on this limitation, the Court emphasized that an indigent habeas petitioner is not entitled to representation for all proceedings that occur subsequent to his attorney’s appointment. Id. at 189-90, 129 S.Ct. at 1488-89. Specifically, the Court discussed a situation where a state proceeding that ordinarily occurs before the filing of a federal habeas petition occurs afterward instead. Such a proceeding, although initiated subsequent to the filing of the federal habeas petition, is not within the scope of § 3599 funding. The Court explained:
The Government likewise argues that our reading of § 3599(e) would require federally funded counsel to represent her client in any state habeas proceeding occurring after her appointment because such proceedings are also “available post-conviction process.” But as we have previously noted, subsection (e) authorizes counsel to represent her client in “subsequent” stages of available judicial proceedings. State habeas is not a stage “subsequent” to federal habeas. Just the opposite: Petitioners must exhaust their claims in state court before seeking federal habeas relief. That state postconviction litigation sometimes follows the initiation of federal habeas because a petitioner has failed to exhaust does not change the order of proceedings contemplated by the statute.
Id. (internal citation omitted).
The Court noted, however, that the language of the statute does contemplate some limited federal funding of counsel in state court proceedings. In one footnote, the Court stated that the “other appropriate motions and procedures” language in § 3599(e) indicated that a District Court may determine that counsel appointed to represent a habeas petitioner may need to “exhaust a [federal constitutional] claim [in state court] in the course of her federal habeas representation” and may be compensated for such work. Id. at 190 n. 7, 129 S.Ct. at 1489 n. 7. The Court was equally quick to note, though, that “[t]his is not the same as classifying state habeas proceedings as ‘available post-conviction process’ within the meaning of the statute.” Id.
Gary disagrees, arguing for a broader reading of § 3599 and Harbison. His position is that the filing of the DNA motion is a “subsequent stage of a judicial proceeding” and “post-conviction process.” It follows, he says, that because § 3599 requires that counsel be afforded for “every” subsequent stage of available judicial proceedings and for “all” available post-conviction process, he has a right to federally funded counsel and expert assistance for this motion.
B.
We decline to adopt such a broad interpretation and conclude, instead, that § 3599 does not provide for federally-funded counsel to assist someone standing in Gary’s shoes in pursuing a DNA motion, the results of which might serve as the basis for an extraordinary motion for a new trial. As the language of § 3599(e) and the Court’s opinion in Harbison indicate, federally-funded counsel is available only for certain subsequent proceedings. *1275 A state court motion for DNA testing does not ordinarily follow the commencement of a federal habeas action and is, therefore, not a subsequent proceeding contemplated by § 3599(e), even when filed after the prisoner’s federal habeas case has concluded. The District Court, therefore, properly denied Gary’s motion for funds to pay for an expert to assist counsel in pursuing DNA testing.
Clemency proceedings and hearings on DNA motions are fundamentally different types of proceedings and should be treated differently for purposes of § 3599(a)(2). A clemency proceeding, by its nature, will typically occur subsequent to the prisoner’s unsuccessful collateral attack on the constitutional validity of his conviction or death sentence. See Ga. Comp. R. & Regs. § 475-3-.10(2)(b) (“Th[e] [clemency] decision will be made after it appears that all appeals through the courts have ceased or been exhausted or anytime within 72 hours of the earliest time the execution could take place even if court action is still pending.”).[28] The “fail safe in our criminal justice system,” Herrera v. Collins, 506 U.S. 390, 415, 113 S.Ct. 853, 868, 122 L.Ed.2d 203 (1993) (internal quotation marks omitted), clemency is a proceeding of last resort for a prisoner before execution. It is, therefore, a unique species of proceeding that is typically subsequent to the conclusion of a § 2254 proceeding.[29]
*1276 The nature and purpose of a DNA motion, however, is quite different. A motion for DNA testing under O.C.G.A. § 5-5-41(c) is generally filed in conjunction with an extraordinary motion for a new trial pursuant to O.C.G.A. § 5-5-41(a) once the thirty-day window for filing a new trial motion has closed. Nothing in the enabling statute, however, requires that the prisoner defer filing his motion for DNA testing and a new trial and until after his state and federal collateral attacks on his conviction (or sentence), if any, have run their course. To the contrary, a prisoner may move for DNA testing and a new trial at any time after thirty days have elapsed from the entry of judgment, so long as the prisoner presents “some good reason ... why the motion was not made during such [thirty-day] period” and satisfies the requirement that the motion for a new trial is “extraordinary.”[30] See O.C.G.A. § 5-5- *1277 41(a)-(b). Thus, unlike a clemency proceeding, there is nothing inherent in a state trial court’s entertainment and consideration of a motion for DNA testing or an extraordinary motion for new trial that indicates such a motion ordinarily follows the commencement of a federal habeas petition. In deciding whether Congress intended that § 3599 provide the basis for funding the prosecution of Gary’s motions for DNA testing and for a new trial, we do not consider, because it is irrelevant, that Gary waited to file those motions until after the United States Supreme Court denied review of this courts’ affirmance of the District Court’s decision denying § 2254 relief. In sum, a DNA motion and an extraordinary motion for a new trial do not ordinarily follow the appointment of counsel in a federal habeas petition and thus are not subject to funding under § 3599.
Gary relies on a footnote in Harbison in arguing that § 3599 could provide for federal representation in a state court proceeding commenced by a prisoner after he has petitioned a federal district court for a writ of habeas corpus. The footnote reads, in full:
Pursuant to § 3599(e)’s provision that counsel may represent her client in “other appropriate motions and procedures,” a district court may determine on a case-by-case basis that it is appropriate for federal counsel to exhaust a claim in the course of her federal habeas representation. This is not the same as elassifying state habeas proceedings as “available post-conviction process” within the meaning of the statute.
556 U.S. at 190 n. 7, 129 S.Ct. at 1489 n. 7.
The Court is describing a scenario in which the prisoner has filed a mixed § 2254 petition, in that it contains constitutional claims that have been exhausted in state court as well as claims that have not been exhausted and the state courts would still entertain them. In this scenario, the district court is likely to stay the litigation of the habeas case while the prisoner repairs to state court to exhaust the unexhausted claim. Footnote 7 simply acknowledges that the district court, in the exercise of its discretion, may authorize § 3599 counsel to prosecute the unexhausted claim in state court.
This case at hand clearly does not present the scenario contemplated by that footnote. It is one thing for a district court to determine, in its discretion, that it is necessary for court-appointed counsel to “exhaust a claim [in state court] in the course of her federal habeas representation,” id., so that counsel can go forward with her prosecution of the prisoner’s federal habeas petition. It is quite another matter, however, for an indigent prisoner to expect federally-funded counsel to initiate an entirely new state court proceeding to obtain relief from a conviction and death sentence on a state law ground — in Gary’s case, on the ground of newly discovered evidence. The filing of Gary’s DNA motion had nothing to do with “exhausting]” a federal *1278 constitutional claim in state court so that the District Court could consider it on the merits in adjudicating Gary’s § 2254 petition. Gary’s claim that he is entitled to DNA testing as a matter of Georgia law was not, and could not have been, included as a claim in his § 2254 petition.
Finally, we note that there are sound policy reasons why Congress would not provide for federally-funded counsel in independent state court proceedings. Two reasons stand out: first, such funding would raise troubling federalism concerns; and second, the funding would create significant practical problems. The Supreme Court has explained on numerous occasions the importance of “the fundamental policy against federal interference with state criminal prosecutions,” Younger v. Harris, 401 U.S. 37, 46, 91 S.Ct. 746, 751, 27 L.Ed.2d 669 (1971), and emphasized that “the States’ interest in administering their criminal justice systems free from federal interference” is a critical concern of federalism. See Kelly v. Robinson, 479 U.S. 36, 49, 107 S.Ct. 353, 361, 93 L.Ed.2d 216 (1986); see also Arizona v. Manypenny, 451 U.S. 232, 243, 101 S.Ct. 1657, 1665, 68 L.Ed.2d 58 (1981) (“Because the regulation of crime is pre-eminently a matter for the States, we have identified ‘a strong judicial policy against federal interference with state criminal proceedings.’ ” (quoting Huffman v. Pursue, Ltd., 420 U.S. 592, 600, 95 S.Ct. 1200, 1206, 43 L.Ed.2d 482 (1975))). Proper respect for the principles of federalism is no less important in the context of federal habeas review of a state prisoner’s death sentence.[31] See Coleman v. Thompson, 501 U.S. 722, 726, 111 S.Ct. 2546, 2552, 115 L.Ed.2d 640 (1991) (“This is a case about federalism. It concerns the respect that federal courts owe the States and the States’ procedural rules when reviewing the claims of state prisoners in federal habeas corpus.”). Providing court-appointed counsel to prisoners challenging their convictions in state court after they have been denied § 2254 relief would put the district courts in the position of overseeing, and thus indirectly managing, counsel’s performance in the state court proceeding. Interference, or at least the appearance of interference, would be inevitable. This could occur in various contexts, including when a district court (1) reviews counsel’s CJA 30 vouchers to determine the reasonableness of the requests for compensation; (2) acts on counsel’s motions, pursuant to § 3599(f), for the provision of investigative, expert, or other services “reasonably necessary” for counsel’s representation of the prisoner; (3) rules on counsel’s motion to withdraw from the prisoner’s representation; or (4) considers a prisoner’s motion to discharge counsel and appoint substitute counsel. Moreover, as a practical concern, in order to pass on the merits of any of these motions or requests, a district judge would have to become acquainted with the issues presented in the state court proceeding despite the fact that the judge may not have confronted them — either directly or indirectly — in adjudicating the prisoner’s habeas claims.
Based on our reading of § 3599, the language of Harbison clearly limiting the *1279 provision of federally-funded counsel, and obvious public policy concerns, we conclude that § 3599 does not provide for the appointment of counsel to prosecute the state post-conviction motion pending in the Superior Court of Muscogee County.
V.
For the reasons set out above, we DISMISS Appeal No. 11-10705, and we AFFIRM the District Court’s decision in Appeals Nos. 09-16198 and 11-15396.
SO ORDERED.

. 18 U.S.C. § 3599 addresses both persons under indictment and awaiting trial in federal court and state prisoners under a sentence of death who petition a United States District Court pursuant to 28 U.S.C. § 2254 for writ of habeas corpus. 18 U.S.C. § 3599(a) reads:
(1) Notwithstanding any other provision of law to the contrary, in every criminal action in which a defendant is charged with a crime which may be punishable by death, a defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services at any time either—
(A) before judgment; or
(B) after the entry of a judgment imposing a sentence of death but before the execution of that judgment;
shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with subsections (b) through (f).
(2) In any post conviction proceeding under section 2254 or 2255 of title 28, United States Code, seeking to vacate or set aside a death sentence, any defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with subsections (b) through (f).

. 18 U.S.C. § 3599(e) states:
[E]ach attorney so appointed shall represent the defendant throughout every subsequent stage of available judicial proceedings, including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

.18 U.S.C. § 3599(f) and (g) state:
(f) Upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant’s attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor under subsection (g). No ex parte proceeding, communication, or request may be considered pursuant to this section unless a proper showing is made concerning the need for confidentiality. Any such proceeding, communication, or request shall be transcribed and made a part of the record available for appellate review.
(g)(1) Compensation shall be paid to attorneys appointed under this subsection at a rate of not more than $125 per hour for in-court and out-of-court time. The Judicial Conference is authorized to raise the maximum for hourly payment specified in the paragraph up to the aggregate of the overall average percentages of the adjustments in the rates of pay for the General Schedule made pursuant to section 5305 of title 5 on or after such date. After the rates are raised under the preceding sentence, such hourly range may be raised at intervals of not less than one year, up to the aggregate of the overall average percentages of such adjustments made since the last raise under this paragraph.
(2) Fees and expenses paid for investigative, expert, and other reasonably necessary services authorized under subsection (f) shall not exceed $7,500 in any case, unless payment in excess of that limit is certified by the court, or by the United States magistrate judge, if the services were rendered in connection with the case disposed of entirely before such magistrate judge, as necessary to provide fair compensation for services of an unusual character or duration, and the amount of the excess payment is approved by the chief judge of the circuit. The chief judge of the circuit may delegate such approval authority to an active or senior circuit judge.

. Gary’s attorneys in his federal habeas case were John R. Martin and Michael K. McIntyre. They were originally appointed pursuant to 21 U.S.C. § 848(q)(4)(B). The relevant language of the two statutes is the same. We refer to their appointments as if they were made under § 3599 for the sake of clarity.

. The DNA motion was filed pursuant to O.C.G.A. § 5-5-41(c). O.C.G.A. § 5-5-41(c) provides, in relevant part:
(1) Subject to the provisions of subsections (a) and (b) of this Code section, a person convicted of a felony may file a written motion before the trial court that entered the judgment of conviction in his or her case, for the performance of forensic deoxyribonucleic acid (DNA) testing.
(2) The filing of the motion as provided in paragraph (1) of this subsection shall not automatically stay an execution.
(3) The motion shall be verified by the petitioner and shall show or provide the following:
(A) Evidence that potentially contains deoxyribonucleic acid (DNA) was obtained in relation to the crime and subsequent indictment, which resulted in his or her conviction;
(B) The evidence was not subjected to the requested DNA testing because the existence of the evidence was unknown to the petitioner or to the petitioner’s trial attorney prior to trial or because the technology for the testing was not available at the time of trial;
(C) The identity of the perpetrator was, or should have been, a significant issue in the case;
*1264 (D) The requested DNA testing would raise a reasonable probability that the petitioner would have been acquitted if the results of DNA testing had been available at the time of conviction, in light of all the evidence in the case;
(E) A description of the evidence to be tested and, if known, its present location, its origin and the date, time, and means of its original collection;
(F) The results of any DNA or other biological evidence testing that was conducted previously by either the prosecution or the defense, if known;
(G) If known, the names, addresses, and telephone numbers of all persons or entities who are known or believed to have possession of any evidence described by subparagraphs (A) through (F) of this paragraph, and any persons or entities who have provided any of the information contained in petitioner's motion, indicating which person or entity has which items of evidence or information; and
(H)The names, addresses, and telephone numbers of all persons or entities who may testify for the petitioner and a description of the subject matter and summary of the facts to which each person or entity may testify.

. Georgia law requires that a motion for new trial be made before the expiration of a 30-day period from the entry of judgment. O.C.G.A. §§ 5-5-40(a), 5-5-41(a). If not made within that 30-day period, a motion for new trial shall not be "made or received unless the same is an extraordinary motion or case; and only one such extraordinaiy motion shall be made or allowed.” Id. § 5 — 5—41 (b).

. The victims were Ruth Schieble, Martha Thurmond, and Kathleen Woodruff. The crimes against them occurred, respectively, on October 21, October 25, and December 28, 1977. Gary v. Hall, 558 F.3d 1229, 1232-33 (11th Cir.2009).

.In addition to the three victims Gary was charged with murdering, see supra note 7, the State also introduced evidence of four other murders as proof of preparation, plan, modus operandi and identity. Those four victims and the dates of their murders were Fern Jackson, September 16, 1977; Jena Dimenstein, September 24, 1977; Mildred Borom, February 12, 1978; and Janet Cofer, April 19, 1978. Gary, 558 F.3d at 1232-33. An eighth victim, Ruth Schwob, was attacked on February 11, 1978 and survived; she did not testify at Gary's trial. A ninth victim, Gertrude Miller, also survived. She was raped and beaten on September 11, 1977, and testified at Gary’s trial, identifying Gary as her assailant. Id.

. The Superior Court for Butts County denied Gary's petition for a writ of habeas corpus, the Georgia Supreme Court denied a certificate of probable cause to appeal, and the United States Supreme Court denied certiorari review. See Gary, 558 F.3d at 1247-48.

. The victim was Janet Cofer. See supra note 8.

. See Gary v. Hall, -U.S.-, 130 S.Ct 742, 175 L.Ed.2d 521 (2009). This court received the Supreme Court’s mandate on December 8, 2009, and the District Court received this court's mandate on December 11, 2009.

. Dr. David had appeared before the District Court at a hearing on February 14, 2007; Morrison appeared at a hearing held on November 21, 2000. The District Court had previously approved the expenditure of $7,000 for Dr. David’s work and $2,000 for Morrison’s.

. Based on a letter written by Gary's counsel on April 16, 2010, the experts appeared without being paid; counsel personally guaranteed payment of their fees.

.We review the decision of a District Court to deny funds for court-appointed experts for abuse of discretion. See United States v. Brown, 441 F.3d 1330, 1363 (11th Cir.2006) (reviewing a denial of funds under a predecessor statute).

.The dissent predicts that “[t]o deny expert funding on the ground that the testimony has already been presented during the course of collateral review is to render § 3599(f) nearly meaningless,” post at 3, and that this decision "requires [the] denial of the overwhelming majority of (if not all) requests for expert assistance at a clemency hearing because none will be 'reasonably necessary,' ” post at 4. We are not persuaded. We are satisfied that the able district judges of this circuit will exercise their discretion based on what the prisoner says in his motion for expert assistance and the comprehensive record before the court. As we have noted, abuse of discretion review is exceedingly deferential. See Childers v. Floyd, 642 F.3d 953 (11th Cir.2011) (en banc) (noting that under an abuse of discretion review "we may only reverse the district court's decision if it fell outside of the ‘broad range of permissible conclusions.’ ” (citing Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 400-01, 110 S.Ct. 2447, 2458, 110 L.Ed.2d 359 (1990))). Our judges will not read our decision as a bright line rule; rather, they will read our decision for what it is — a determination that, given the circumstances of this particular case, the denial of funds was not an abuse of discretion.

. Other circuits have concluded that where an indigent defendant seeks funding to provide testimony that is merely cumulative of evidence already in the record and when the indigent prisoner does not persuade the court that there are any particular circumstances of the case warranting in-person testimony, a District Court does not abuse its discretion in refusing to provide funds. See Fautenberry v. Mitchell, 572 F.3d 267, 269-71 (6th Cir.2009) (denying funds for a clemency hearing); Smith v. Dretke, 422 F.3d 269, 287-89 (5th Cir.2005) (refusing funds for a 28 U.S.C. § 2254 proceeding).

. For an example of the CJA 30 form, see U.S. Courts, CJA-0030, Death Penalty Proceedings: Appointment of and Authority to Pay Court-Appointed Counsel (last revised Feb. 2012), available at http://www.uscourts. gov/uscourts/formsandfees/forms/cja/cja30. pdf.

. Gary claimed that he was preparing a second application for clemency and that the application would be covered by § 3599. The District Court approved compensation for such preparation.

. Other circuits agree that CJA attorney-compensation rulings are not appealable under 28 U.S.C. § 1291. See In re Carlyle, 644 F.3d 694 (8th Cir.2011); United States v. French, 556 F.3d 1091, 1093 (10th Cir.2009) (observing "[e]very circuit court of appeals to consider this jurisdictional question has held that CJA fee compensation determinations made by the district court are not appeal-able”); United States v. Bloomer, 150 F.3d 146, 148 (2d Cir.1998) (holding that orders concerning fee determinations for services already rendered under the CJA are not appeal-able); United States v. Stone, 53 F.3d 141, 143 (6th Cir. 1995); Shearin v. United States, 992 F.2d 1195, 1196 (Fed.Cir.1993); United States v. Davis, 953 F.2d 1482, 1497 n. 21 (10th Cir.1992); Landano v. Rafferty, 859 F.2d 301, 302 (3d Cir.1988); United States v. Walton (In re Baker), 693 F.2d 925, 926 (9th Cir.1982); United States v. Smith, 633 F.2d 739, 742 (7th Cir.1980).

.Of course, there are some minor differences. For example, in a death-penalty appointment there is no statutory compensation maximum, interim payments are recommended, and different voucher forms are used. See 7 Guide to Judiciary Policy: Defender Services, pt. A, § 630 (last revised 2011), available at http://www.uscourts.gov/ FederalCourts/AppointmentOfCounsel/ Viewer.aspx?doc=/uscourts/FederalCourts/ AppointmentOfCounsel/vol7/VoL07.pdf.

. The dissent claims that the court "reinterprets circuit precedent to the point of nonrecognition,” stating that it is important to decide "what the district court did — and did not — decide in the January 21, 2011 order at issue in Appeal No. 11-10705.” Post at 1281-82. We agree that it is important to be crystal clear in what was and was not decided, as well to understand the procedural posture of the dispute. As we describe in the introduction to this part, we must first understand the history behind the January 21, 2011 order. On December 1, 2010, Gary's attorneys submitted a CJA 30 voucher for their compensation. On December 10, 2010, the District Court denied part of their requested compensation. On December 23, 2010, Gary's attorneys filed a motion for reconsideration of the denial of compensation. Then, on January 21, 2011, the District Court denied part of the compensation Gary’s attorneys requested. Thus, the issue before this court is whether the District Court erred in denying part of Gary's attorneys’ compensation requested in the CJA 30 voucher. The issue is not whether the District Court erred in denying a motion by Gary to expand the scope of his appointed attorneys’ representation to include the prosecution of his DNA motion and a new trial, or, alternatively, to appoint counsel to represent him in those proceedings. In the plainest of terms, this is a case about Gary’s attorneys seeking compensation, not Gary seeking representation.
The dissent implies that we should disregard the procedural posture of the case. Even though the District Court’s decision was an otherwise non reviewable CJA-voucher compensation decision, such a decision can morph into a reviewable denial of Gary’s right to representation, the dissent implicitly argues, because of the reason given to deny Gary’s attorneys’ compensation. The dissent highlights two controlling cases — Harbison v. Bell, 556 U.S. 180, 129 S.Ct. 1481, 173
L.Ed.2d 347 (2009) and In re Lindsey, 875 F.2d 1502 (11th Cir.1989) (per curiam)— where the orders are "practically indistinguishable” from the CJA denial at issue here. Post at 10.
Such reliance is misplaced. Indeed, to realize why these cases actually support our understanding, we must ask this question: what was the procedural posture in those two cases? In Harbison, the motion at issue was filed in a live controversy and was entitled, "Request for Leave to Expand Appointment Order.” See Harbison v. Bell, 1:97-CV-52, 2007 WL 128954, at *1 (E.D.Tenn. Jan. 16, 2007). Likewise, in In re Lindsey, the motion was styled as a "MOTION FOR STAY OF EXECUTION AND FOR APPOINTMENT OF COUNSEL.” See In re Lindsey, 875 F.2d at 1503. Both cases involved a request by the indigent defendant for representation, not their attorneys for compensation. Both cases were reviewable because the prisoner’s rights were placed squarely at issue by the prisoner himself.
Rodriguez decided that CJA compensation decisions are not appealable. See United States v. Rodriguez, 833 F.2d 1536, 1537-38 (11th Cir.1987) (per curiam). The decision at issue here is a compensation decision, plain and simple. A prisoner’s claim pertaining to the scope of his or her statutory entitlement to representation can easily be presented to the District Court in a motion for appointment of counsel or to expand the scope of representation, just as the petitioners in Harbison and In re Lindsey did. That procedural posture, though, is simply not what we have in Appeal No. 11-10705. The dissent thought it strange, post at 1266, that we had jurisdiction to review the denial of expert assistance, but not the partial denial of the CJA fee determination, even though the merits of both turned on the scope of § 3599. As we explain in note 26 infra, however, the motion at issue in Appeal No. 11-15396 was properly presented
*1272 to the District Court in a motion filed by Gary asserting his rights to additional funds to expand the previous appointment of his expert. We have jurisdiction to review a final determination of Gary's rights, but do not have jurisdiction to review a CJA fee determination rooted in his attorney's right to compensation. There is no paradox about this disparate treatment.

. The victims are identified in notes 7 and 8, supra.

. The Superior Court ordered tests of the following items: a slide from a vaginal washing of Jean Dimenstein, a swab of Martha Thurmond's abdomen, a slide from a vaginal washing of Martha Thurmond, and a slide from vaginal contents of Kathleen Woodruff.

. On August 25, 2011, the Superior Court ordered DNA testing of the following items found at the scene of Gertrude Miller’s rape and beating: a white sleeping gown, underclothing, and a white slip. Gertrude Miller survived the attack and testified at Gary’s trial, identifying him as her assailant. See supra note 8.

. In its order denying Gary’s request for additional funding, the District Court indicated that, on June 4, 2010, it approved funding for Dr. Hampikian with the expectation that Gary was preparing to file a second application for clemency and, to assist counsel in such preparation, would seek funds for expert services under § 3599(f). A second application for clemency was not forthcoming, however, so the District Court concluded that Gary wanted the additional funding to finance his motion for a new trial.

.After appointing counsel pursuant to § 3599(a)(2), the District Court retains jurisdiction to monitor the appointment administratively, until such time as the prisoner is no longer entitled to representation in a posthabeas case proceeding designated in § 3599(e), see supra note 2. Compensation issues that arise ancillary to the counsel's § 3599(a)(2) appointment, including the approval of CJA 30 vouchers for attorney's fees and the approval funding of "reasonably necessary'' expert services provided by § 3599(f), are examples of issues the District Court retains power to consider. The case remains live for that limited purpose.
This appeal is of the denial of a motion filed by Gary, asserting his right under § 3599(f) *1273 for the District Court to provide funds for services Gary believes are “reasonably necessary” to assist his lawyers in prosecuting his motion for DNA testing in the Superior Court of Muscogee County. Gary properly asserted his right in a motion before the District Court. Cf. supra note 21. Gary also implicitly argued to the District Court that, in addition to the provision of funds to pay for the services of an expert under § 3599(f), the District Court should also expand his lawyers' § 3599(a)(2) appointment in the federal habeas case to include the state proceedings. The District Court disagreed on both fronts. Thus, in appealing the District Court's denial of § 3599(f) funds to hire Dr. Hampikian, Gary also effectively appealed the District Court's refusal to expand the scope of the § 3599(a)(2) appointment that would have allowed his lawyers to represent him before the Superior Court.
In sum, we conclude that the District Court had retained jurisdiction to determine the scope of duties encompassed under the § 3599(a)(2) appointment and the availability of expert funds under § 3599(f), and whether the DNA motion fell within that ambit of representation. We have jurisdiction under 28 U.S.C. § 1291 to review the District Court’s determination on Gary's motion, which is a final decision. See Harbison v. Bell, 556 U.S. 180, 183, 129 S.Ct. 1481, 1485, 173 L.Ed.2d 347 (2009) (holding that a district court's denial of representation for an indigent prisoner contending that he has a statutory right to representation is a final appealable order under § 1291).

. Two limitations that are not relevant here are: (1) if his conviction or death sentence is set aside, the prisoner is not entitled to the appointment of counsel under § 3599 for retrial in state court, despite the fact that the retrial would occur subsequent to the conclusion of the prisoner’s federal habeas case, Harbison v. Bell, 556 U.S. at 189, 129 S.Ct. at 1488 ("We do not read [§ 3599](e) to apply to state-court proceedings that follow the issuance of a federal writ of habeas corpus.”); and (2) if the State provides counsel for any proceeding otherwise covered by § 3599, federal funding is not available, id. ("[S]ubsection (a)(2) provides for counsel only when a state petitioner is unable to obtain adequate representation.”).

. An execution could not go forward until the federal courts have considered and disposed of the prisoner's petition for a writ of habeas corpus. See Lonchar v. Thomas, 517 U.S. 314, 320, 116 S.Ct. 1293, 1297, 134 L.Ed.2d 440 (1996) ("If the district court cannot dismiss the [habeas] petition on the merits before the scheduled execution, it is obligated to address the merits and must issue a stay to prevent the case from becoming moot.”). A clemency proceeding in Georgia, at a minimum, cannot be held until after the prisoner has been denied habeas relief.

. The dissent claims that a motion for a new trial is like a clemency hearing in that each presents “a final chance to rectify any fundamental miscarriage of justice.” Post at 1287. The dissent continues, noting that extraordinary motions for a new trial can be filed "at any time after the expiration of the thirty-day statutory period,” id. at 1288 (emphasis omitted), and are "typically” filed after the prisoner has been denied federal habeas relief, id. at 1287. The dissent concludes that, as a result, the two are alike in that "[t]he most appropriate time for an individual to file one of these motions would undoubtedly be after all the evidence has been investigated, the facts developed, and the arguments made in the traditional channels of review (i.e. state postconviction and federal habeas proceedings).” Id. (emphasis omitted). In taking this view, the dissent draws an indefensible parallel between an extraordinary motion for a new trial and a clemency proceeding.
A clemency proceeding is, as the Supreme Court observed, a final chance to rectify any fundamental miscarriage of justice. See Herrera v. Collins, 506 U.S. 390, 415, 113 S.Ct. 853, 868, 122 L.Ed.2d 203 (1993); see also Utah Admin. Code r. 671-312-3(5) (allowing for a second clemency review, despite an earlier proceeding); David Schwartz, Arizona Executes Killer Who Fought Clemency Board, Chi. Trib., June 27, 2012, http://articles. chicagotribune.com/2012-06-27/news/sns-rtus-usa-execution-arizonabre85qlcm20120627_l_estafana-holmes-clemency-board-reprieve (noting that the Arizona clemency board rejected the inmate’s application on the Friday preceding his execution); Andrew Welsh-Huggins, Gov. Kasich Grants Two-Week Reprieve to Death-row Inmate, News-Messenger (Fremont, Ohio), June 6, 2012, http ://www.thenews-messenger. com/ article/20120606/NEWS01/206060312/GovKasich-grants-two-week-reprieve-death-rowinmate (stating that the Ohio Parole Board voted against mercy in the month preceding the execution date); Mississippi Gov. Phil Bryant Won’t Stop Execution for 1990 Slayings, Gulflive.com, June 05, 2012, http://blog. gulflive.com/mississippi-press-news/2012/06/ mississippi_gov_phiLbryant_wo.html (reporting that the Governor of Mississippi refused mercy on the afternoon of the execution date).
An extraordinary motion for a new trial is entirely different. Georgia law, for example, is clear in that an extraordinary motion for a new trial is subject to stringent limitations and cannot be used as a "final” chance for relief.
*1276 The statutes which control extraordinary motions for new trial based on newly discovered evidence require a defendant to act without delay in bringing such a motion. OCGA §§ 5-5-23 and 5-5-41 (Code Ann. §§ 70-204 and 70-303). The obvious reason for this requirement is that litigation must come to an end.
Drane v. State, 728 S.E.2d 679, 2012 WL 2369437, at *5 (Ga.2012) (quoting Llewellyn v. State, 252 Ga. 426, 314 S.E.2d 227, 229 (1984)); see also Davis v. State, 283 Ga. 438, 660 S.E.2d 354, 359 (2008) ("Thus, it appears that Davis has not been diligent in presenting tírese affidavits to the trial court, which is another of the requirements in an extraordinary motion for new trial."); Llewellyn, 314 S.E.2d at 229 (Ga.1984) (requiring both due diligence to discover the information and prompt filing of the motion once information is in hand). Other States provide different post-conviction procedures for seeking a new trial based on newly-discovered evidence; such procedures must be invoked promptly, after the new evidence has been discovered. See, e.g., Ala. R.Crim. P. 32.1(e)(1) (providing that an individual can bring a newly-discovered evidence claim if "[t]he facts relied upon were not known by the petitioner or the petitioner's counsel at the time of trial or sentencing or in time to file a posttrial motion pursuant to Rule 24, or in time to be included in any previous collateral proceeding and could not have been discovered by any of those times through the exercise of reasonable diligence"); Ky. R.Crim. P. 10.06(a) ("The motion for a new trial shall be served not later than five (5) days after return of the verdict. A motion for a new trial based upon the ground of newly discovered evidence shall be made within one (1) year after the entry of the judgment or at a later time if the court for good cause so permits.”); Fields v. State, 151 Idaho 18, 253 P.3d 692, 699 (2011) (describing post-conviction procedure to bring a newly-discovered evidence claim and noting that "[the defendant] was required to bring those claims within a reasonable time after they were known or should have been known. Claims not raised within that reasonable time are deemed waived” (citation omitted)); State v. Unsworth, 2010 WL 415415, at *2 (Ohio Ct.App.2010) ("Although [Ohio R.Crim. P. 33(B) ] itself does not provide a specific time limit for the filing of a motion for leave to file a delayed motion for new trial, [a] trial court may require a defendant to file his motion for leave to file within a reasonable time after he discovers the evidence.” (alteration in original) (internal quotation marks omitted)).
Thus, unlike a clemency proceeding, which commonly occurs as a final chance to prevent a miscarriage of justice, the time for filing a motion for a new trial based on newly discovered evidence depends entirely on when the prisoner discovered the evidence. It is simply incorrect to assert that an extraordinary motion for a new trial is "typically” filed after a federal habeas petition or that an extraordinary motion for a new trial would be held in reserve as a measure of last resort. On the other hand, a prisoner who obtains evidence that would support a clemency application can sit on that evidence until the last possible moment. In sum, if a prisoner discovers new evidence that might prompt the court in which he was convicted and sentenced to grant a new trial (or a new sentencing hearing), the prisoner must act with dispatch. This means that if, after filing a § 2254 petition, a prisoner discovers evidence that would warrant the granting of a new trial, the prisoner runs the risk of having his motion for new trial declared untimely if he does not file his motion immediately.

. In cases like Gary’s, where DNA testing was not available at the time of conviction, *1277 such a showing is not likely to be difficult. There are additional restrictions on when a motion may be filed. See Daniel's Georgia Criminal Trial Practice § 28-12 (2011-2012 ed.) (noting that "[t]he usual ground stated for the filing of an extraordinary motion for a new trial is the discovery of newly found evidence” and listing six requirements that a movant must show, including that " 'it was not owing to the want of due diligence that he did not acquire it sooner’ ”) (quoting Timber-lake v. State, 246 Ga. 488, 271 S.E.2d 792, 795 (1980)); see also O.C.G.A. § 5-5-23 ("A new trial may be granted in any case where any material evidence, not merely cumulative or impeaching in its character but relating to new and material facts, is discovered by the applicant after the rendition of a verdict against him and is brought to the notice of the court within the time allowed by law for entertaining a motion for a new trial.”).

. The dissent claims that the Supreme Court has dismissed federalism as a reason for concern. See post at 26. Surely, it is beyond serious dispute that the potential interference arising from close federal supervision over state court proceedings pertaining to an extraordinary motion for a new trial — a proceeding that may last for a significant period of time — presents far more compelling reasons to be concerned than the risk of federal interference with a single clemency board review that may or may not even involve a single hearing. This is yet another illustration of the substantial differences between a clemency proceeding, on the one hand, and an extraordinary motion for a new trial containing issues that have not been presented to the district court on the other.